CALABRIA, Judge.
 

 *193
 
 The State appeals from the trial court's order granting defendant's motion for appropriate relief ("MAR") on the basis of newly discovered evidence pursuant to N.C. Gen.Stat. § 15A-1415(b)(3), "favorable" post-conviction DNA results pursuant to N.C. Gen.Stat. § 15A-270(c), and violations of the U.S. Constitution. For the reasons that follow, we vacate the trial court's order and remand for an evidentiary hearing.
 

 *194
 

 I. Background
 

 The factual genesis of this case was the 27 November 1991 murders of Doris Washington ("Doris") and her thirteen-year-old daughter, Nishonda Washington ("Nishonda"). Approximately one year after the murders, Darryl Anthony Howard ("defendant") was arrested and indicted on two counts of first degree murder and one count of first degree arson. At defendant's trial in March 1995, both first degree murder charges were reduced to second degree murder. The jury found defendant guilty of both murders and the associated arson. Defendant received an
 
 *788
 
 eighty-year sentence, which he appealed. This Court concluded that his trial was free from error.
 
 See
 

 State v. Howard,
 

 122 N.C.App. 754
 
 ,
 
 476 S.E.2d 147
 
 (1996), No. COA95-1156, WL 34899110, at *1,
 
 disc. review denied,
 

 347 N.C. 272
 
 ,
 
 493 S.E.2d 755
 
 (1997). The evidence presented by the State at defendant's 1995 trial established the following facts.
 

 Shortly after 1:00 a.m. on 27 November 1991, the Durham Fire Department responded to a call regarding an apartment fire in Few Gardens, a Durham public housing community. Shortly after Durham Firefighter Robert Wesley McLaughlin, Jr. ascended to the smoke-filled apartment's second floor, he discovered the nude bodies of Doris and Nishonda lying face down on a bed in the front bedroom. The fire had been intentionally set in a closet located in the rear upstairs bedroom.
 

 Eric Campin ("Campin"), a crime scene technician with the Durham Police Department ("DPD"), arrived at the crime scene around 7:00 a.m. During his investigation, Campin observed a console TV sitting on the apartment's lower level floor. The TV had been pulled away from the wall, and cable or VCR wires lay on the floor beside it. After Campin observed a dust pattern on top of the TV, which in his experience was an indication of theft, he surmised that a VCR or similar appliance was missing.
 

 Doris and Nishonda's autopsies were performed at approximately 10:30 a.m. on 27 November 1991. Dr. Robert L. Thompson, a forensic pathologist, testified regarding the results, which revealed that Nishonda died from ligature strangulation. While certain evidence suggested that Doris was also strangled, it was determined that she had died from a "blunt force injury to [her] abdomen which caused extensive internal bleeding." Both Nishonda and Doris died before the apartment caught fire.
 

 Sexual assault kits ("rape kits") were collected from Doris and Nishonda, a routine occurrence when a victim "has obviously [been sexually assaulted] or [there is] a possibility of having been sexually
 
 *195
 
 assaulted." Dr. Thompson discovered "a moderate number of well [-] preserved" sperm heads in Nishonda's anal cavity, and subsequent testing of Nishonda's rape kit also detected sperm on her vaginal smears. DNA analysis excluded defendant as a source of the sperm found in Nishonda's vagina and anus. Doris' vagina was torn (one-half inch laceration) and contained a small amount of blood-tinged fluid, but no sperm was detected in any of her body cavities or in her rape kit. Dr. Thompson determined that Doris' vagina was torn around the time of her death and that "something had to be placed inside [it] ... some pressure put on it to cause that tear." He also determined that Doris had ingested cocaine "fairly recent[ly]" prior to her death.
 

 Roneka Jackson ("Jackson"), a Few Gardens resident who knew Doris, Nishonda, and defendant, testified that Doris used and sometimes sold cocaine. According to Jackson, during the afternoon of 26 November 1991, defendant went to Doris' apartment in search of his girlfriend, but Doris would not let him inside. An argument ensued, and before defendant left, he said to Doris, "I am going to kill you and your daughter." Around 10:00 p.m. that evening, Jackson saw defendant and his brother, Bruce, walking out of Doris' back door carrying a television. After setting the television in his car, defendant placed a three or four minute phone call from a public telephone and then drove away with his brother. Jackson then noticed smoke coming from a back window of Doris' apartment; fire trucks arrived approximately fifteen minutes later.
 

 Rhonda Davis ("Davis") was at Doris' apartment getting high on cocaine from approximately 10:30 a.m. to 10:30 p.m. on 26 November 1991. To the best of Davis' knowledge, Doris did not sell cocaine but she did allow a group of dealers from Miami and another from New York
 
 [1]
 
 to sell drugs from her apartment. After Nishonda went to bed around 10:30 p.m., Davis and Doris left the apartment for a short while and split up. Hoping to buy some cocaine, Davis returned
 
 *789
 
 to Doris' apartment around midnight and knocked on the back door. After approximately five minutes, defendant appeared at the window and told Davis that he and Doris were "busy." Davis then "heard some dishes rattling in the sink or something." After walking around to the front door, Davis "heard somebody going up the steps." Davis then left.
 

 Few Gardens resident Terry Suggs ("Suggs") saw smoke coming from Doris' apartment sometime after midnight on 27 November 1991.
 

 *196
 
 A few minutes before seeing the smoke, Suggs saw defendant and a female walking through the gap between Doris' apartment building and the adjacent building.
 

 Around midnight on 27 November 1991, Kevin Best ("Best") and Dwight Moss ("Moss") were standing across from Doris' apartment. According to Best, defendant and another male-who Moss claimed was defendant's brother, Kenny-exited the back door of Doris' apartment carrying a television and a VCR. "[N]o more than [ten] minutes" later, Best saw smoke coming from Doris' apartment window.
 

 Moss had heard that Doris sold drugs for a person he referred to as "the New York Boy." According to Moss, defendant "hung around" with the New York Boys and was "kind of with them." During his testimony, Moss stated that he saw defendant and Doris arguing about money and drugs during the afternoon of 26 November 1991. Defendant told Doris that she had "messed up the money" and "messed up the drugs," yelled "I'll kill you," and then walked away. Around 11:10 p.m., Moss saw defendant and another male
 
 [2]
 
 "coming around from the backside of" Doris' apartment. The men were carrying what looked like a television and a VCR.
 

 Angela Oliver ("Oliver"), who knew defendant but did not know Doris, testified for the State and was designated a hostile witness by the trial court. Oliver testified that she was interviewed by Detective Darryl Dowdy of the DPD ("Detective Dowdy"). On 10 October 1992, nearly a year after the murders, Detective Dowdy-the lead investigator on the case-received a tip that Oliver wanted to talk and he interviewed her the same day. During her trial testimony, Oliver stated that she told the truth to Detective Dowdy in the interview, that the interview was tape recorded, and that a transcript of the tape was prepared. The interview transcript was admitted into evidence and Oliver's tape-recorded statement was played in court.
 

 During the interview, Oliver stated that she and defendant went to Doris' apartment between 5:00 and 6:00 p.m. "to get [defendant's] money or drugs," but Doris did not have either one. Defendant told Doris that if she did not have his money or his drugs when he returned, he would "kill her mother----ing ass." Sometime later, between 10:00 p.m. and 1:00 a.m., defendant, his brother, Harvey, and Oliver returned to Doris' apartment. Doris still did not have the money or drugs, so defendant "started jumping on her" and pushing her against the wall. Defendant then asked
 
 *197
 
 Oliver to go outside because he did not want her to "be around what he [was] fixing to do." Before Oliver exited the apartment, she saw defendant taking Doris upstairs. According to Oliver, "the next thing I kn[e]w, there was a lot of noise. [Doris] was hollering and screaming[,]" saying something about Nishonda being in the apartment. Eventually, the upstairs lights went on and "it got quiet." At that time, defendant's brother entered the apartment. After defendant set a fire in the apartment, he told his brother that "he had to burn them up. He didn't want to leave no evidence." Before they left, defendant's brother removed something from the apartment wrapped in a sheet and sold it on the street.
 

 When defendant and his brother, Harvey, were taken into custody in November 1992
 
 [3]
 
 ,
 
 *790
 
 Durham Fire Marshall Milton Smith ("Smith")-who had investigated the fire and murder scene at Doris' apartment-arrived at the Durham Magistrate's Office to complete the booking process. While Smith was collecting information from Harvey, defendant told Smith that his brother, Kenny, not Harvey, was with him at Few Gardens when the fire occurred. Smith then asked defendant, "So, it was your brother Kenneth when you did this thing," to which defendant responded, "Yes, it was me and Kenny." Defendant then leaned over to Smith and added, "You are a smart mother----er, ain't you?"
 

 Gwyndelyn Taylor ("Taylor"), who testified that she knew both defendant and Doris, saw defendant at a Durham nightclub sometime between 27 November and 31 December 1991. While there, Taylor overheard someone ask defendant if he killed Doris, to which defendant responded, "[Y]eah, I killed the bit-. The next one to get in [my] way [I'll] mess them up too."
 

 *198
 
 Defendant and Natasha Mayo ("Mayo")-defendant's girlfriend and the mother of his son-testified in defendant's defense. According to Mayo, defendant went to Doris' apartment two days before her death, and he was looking for Mayo. Defendant was angry to find Mayo there because Doris had encouraged Mayo and other women to have sex with men in exchange for drugs. Mayo further testified that on 26 November, she was with defendant while he was selling drugs out of the Few Gardens apartment of Sharon Bass ("Bass"). Around midnight, Bass and defendant went to get cocaine from "the New York Boy['s]" apartment, which was located in Doris' apartment building. At that time, defendant and Mayo noticed smoke coming from Doris' apartment so they ran back to Bass' apartment because defendant feared he would be cited for trespassing in Few Gardens. Mayo maintained that she and defendant remained at Bass' apartment for the rest of the night, smoking cocaine.
 

 According to defendant, Doris never sold drugs for him but she did sell drugs for the New York Boys. Defendant acknowledged retrieving Mayo from Doris' apartment two days before the murders because, "Doris ha[d] a habit of using other women to get her own drugs." He also stated that Doris did not owe him any money or drugs at the time of her death. Defendant denied killing Doris and Nishonda and denied setting their apartment on fire.
 

 Approximately five months after defendant's trial, in August 1995, Jackson was murdered in Brooklyn, New York, by two members of the New York Boys gang. "Because they could not find a gun," the two men "broke [Jackson's] neck, doused her with gasoline, and lit her on fire."
 
 United States v. Celestine,
 

 43 Fed.Appx. 586
 
 , 589-90 (4th Cir.2002).
 

 In May 1997, defendant filed a
 
 pro se
 
 MAR in Durham County Superior Court, which was denied. Shortly thereafter, in October 1997, the North Carolina Supreme Court denied defendant's petitions for writ of certiorari and for discretionary review.
 
 State v. Howard,
 

 347 N.C. 272
 
 ,
 
 493 S.E.2d 755
 
 (1997).
 

 In May 2004, Moss executed a sworn affidavit recanting a prior statement that he had given to Detective Dowdy, which was read into evidence at defendant's trial. Moss alleged that he was coerced by Detective Dowdy and other DPD officers to provide a false and inaccurate statement against defendant. Moss also claimed that he could not possibly
 
 *791
 
 have been in all the places described in his statement.
 
 [4]
 

 *199
 
 In 2009, defendant's
 
 pro Bono
 
 counsel moved the Durham County trial court to have post-conviction DNA testing performed on Doris and Nishonda's rape kits pursuant to N.C. Gen.Stat. § 15A-269. The court granted defendant's motion. Using advanced technology, a private lab conducted testing on Doris' vaginal swabs and discovered a previously undetected male DNA profile. Defendant was excluded as the source. However, a search of "CODIS," the FBI's national DNA database, generated a "hit" on the profile of Jermeck Jones ("Jones"), who had lived in the Few Gardens area as a teenager and dated Nishonda in the weeks preceding her murder, and who was later incarcerated in Tennessee for various offenses.
 
 [5]
 
 Consequently, in late 2012, defendant's counsel sent private investigator Jerry Waller ("Waller") to interview Jones. During the interview, Jones stated that he had sex with Nishonda at a friend's house on the night before her murder, but maintained that he had neither met nor had sex with Doris and that he had never been to Doris and Nishonda's apartment. Waller reduced the content of his interview with Jones to a sworn affidavit in September 2013.
 
 [6]
 

 After moving for post-conviction DNA testing in 2009, defendant's counsel received-pursuant to an open-file discovery request-the State's entire investigative file from the 1995 murder trial. Included in the State's files was a police informant's routing slip ("the memo"), which contained information from an anonymous informant regarding Doris and Nishonda's murders. The memo, dated 1 December 1991, contained the following information:
 

 Reference Double Homicide/Arson Phew [sic] Gardens. Informant advised me that subjects were probably murdered because mother owed $8,000.00 to drug dealers from either Philadelphia or New York.
 

 Informant stated that many residents in Phew [sic] Gardens were offered two-thousand dollars a week for use of their apartment but apparently not many accepted.
 

 Informant further stated that perpetrators were believed to have left 4 bags of drugs at the apt. and apparently found some contents missing when they came for them.
 

 *200
 
 The perps. then told the victim/tenant she owed them eight-thousand dollars. When perps. came for the money they first raped her before strangling her. The 13 yr. old daughter may have unknowingly walked in on the seen [sic] so then killed her.
 

 Also written in the memo's margin was a note to Detective Dowdy from then-Durham Police Captain E.E. Sarvis ("Captain Sarvis): "Dowdy There may be something to this. I don't remember any public info on the rape. EES[.]" In conjunction with the police memo, defendant submitted the affidavit of his trial counsel, H. Wood Vann ("Vann"), who averred that he had no "independent recollection of ever receiving or seeing" this document, "through discovery or otherwise," before trial. Vann also averred that the memo was "highly exculpatory" and that it would have "eviscerate[d] the State's theory at trial."
 

 On 19 March 2014, defendant filed a second MAR in Durham County Superior Court. Defendant based his motion for a new trial primarily upon the grounds of newly discovered evidence: Jackson's murder, Moss' recantation, the post-conviction DNA results and Waller's affidavit containing Jones' statements regarding the results, and the memo. Pursuant to our Criminal Procedure Act,
 

 a defendant at any time after verdict may by [an MAR], raise the ground that evidence is available which was unknown or
 
 *792
 
 unavailable to the defendant at the time of trial, which could not with due diligence have been discovered or made available at that time, including recanted testimony, and which has a direct and material bearing upon ... the defendant's guilt or innocence.
 

 N.C. Gen.Stat. § 15A-1415(c). "This section of the statute codifies substantially the rule previously developed by case law for the granting of a new trial for newly discovered evidence."
 
 State v. Powell,
 

 321 N.C. 364
 
 , 371,
 
 364 S.E.2d 332
 
 , 336 (1988) (citing
 
 State v. Beaver,
 

 291 N.C. 137
 
 ,
 
 229 S.E.2d 179
 
 (1976) ). To prevail upon an MAR based on the ground of newly discovered evidence, a defendant is required to establish that:
 

 (1) the witness or witnesses will give newly discovered evidence; (2) the newly discovered evidence is probably true; (3) the evidence is material, competent and relevant; (4) due diligence was used and proper means were employed to procure the testimony at trial; (5) the newly discovered evidence is not merely cumulative or corroborative; (6) the new evidence does not merely tend to contradict,
 
 *201
 
 impeach or discredit the testimony of a former witness; and (7) the evidence is of such a nature that a different result will probably be reached at a new trial.
 

 State v. Rhodes,
 

 366 N.C. 532
 
 , 535,
 
 743 S.E.2d 37
 
 , 39 (2013) (citing
 
 Beaver,
 

 291 N.C. at 143
 
 ,
 
 229 S.E.2d at
 
 183 ).
 

 Defendant also alleged violations of his due process rights based on the State's failure to disclose material exculpatory evidence under
 
 Brady v. Maryland,
 

 373 U.S. 83
 
 ,
 
 83 S.Ct. 1194
 
 ,
 
 10 L.Ed.2d 215
 
 (1963) and the State's presentation of false evidence under
 
 Napue v. Illinois,
 

 360 U.S. 264
 
 ,
 
 79 S.Ct. 1173
 
 ,
 
 3 L.Ed.2d 1217
 
 (1959). Finally, defendant claimed that the post-conviction DNA results were "favorable" to him pursuant to N.C. Gen.Stat. § 15A-270(c).
 

 The State filed a 1 May 2014 response, and moved that defendant's MAR be denied. Defendant replied to the State's response on 16 May 2014. On 27 May 2014, without conducting an evidentiary hearing, the trial court entered an order which granted defendant's MAR, vacated his convictions, and granted him a new trial. The State appeals.
 

 II. Analysis
 

 A.
 
 Appellate Jurisdiction
 

 As an initial matter, we must address defendant's motion to dismiss on the grounds that the State has no right to appeal from certain portions of the trial court's order. In this case, the trial court granted defendant's MAR on three different legal grounds: (1) newly discovered evidence, (2) constitutional violations, and (3) "favorable" post-conviction DNA test results. The State cites
 
 State v. Peterson,
 

 228 N.C.App. 339
 
 ,
 
 744 S.E.2d 153
 
 ,
 
 review denied
 
 and
 
 review dismissed,
 

 367 N.C. 284
 
 ,
 
 752 S.E.2d 479
 
 (2013), for the proposition that N.C. Gen.Stat. § 15A-1445(a)(2) "provides a means for the State to appeal an order granting [an MAR] in its entirety even where, as here, the trial court grants the motion based upon both newly discovered evidence and other grounds." In response, defendant argues that, under
 
 State v. Norman,
 

 202 N.C.App. 329
 
 ,
 
 688 S.E.2d 512
 
 (2010), the State has no right to appeal an MAR granted, in part, pursuant to N.C. Gen.Stat. § 15A-270(c).
 
 [7]
 
 According to defendant,
 
 *202
 
 even if this Court determines that the trial court erred in granting him a new trial based on newly discovered evidence, the State's appeal under section 15A-1445(a)(2) is futile because it cannot appeal the other bases upon which the trial court granted defendant's MAR. As a precautionary measure, the State filed an alternative petition for writ of certiorari contemporaneously with its response to defendant's motion to dismiss. The alternative petition requested this Court to review the trial court's MAR order "pursuant to Rule 21 and/or Rule 2 of the North Carolina Rules of Appellate Procedure[.]"
 
 *793
 
 Our Supreme Court has recognized that the State's right to appeal "in a criminal case is statutory, and statutes authorizing an appeal by the State in criminal cases are strictly construed."
 
 State v. Elkerson,
 

 304 N.C. 658
 
 , 669,
 
 285 S.E.2d 784
 
 , 791 (1982) (citations omitted). Appellate jurisdiction in criminal appeals by the State is governed, in general, by section 15A-1445.
 

 In
 
 Peterson,
 
 the trial court granted the defendant's MAR for a new trial based on newly discovered evidence and constitutional violations.
 
 Id.
 
 at 342-43,
 
 744 S.E.2d at 156-57
 
 . This Court concluded that the State's appeal was properly before it:
 

 Pursuant to N.C. Gen.Stat. § 15A-1445 [ (a)(2) ], the State may appeal an order granting a motion for a new trial "on the ground of newly discovered or newly available evidence but only on questions of law." Accordingly, because the trial court granted [the] defendant's MAR based, in part, on newly discovered evidence, the State had the right to appeal the MAR order. We note that the State, in case we found that the MAR order was based solely on
 
 Brady
 
 violations, filed a petition for
 
 writ of certiorari.
 
 Since
 
 certiorari
 
 is not necessary to confer jurisdiction on this Court, we dismiss the State's petition.
 

 Id.
 
 at 343,
 
 744 S.E.2d at 157
 
 .
 

 According to defendant, however, our decision in
 
 State v. Norman
 
 precludes the State from appealing the portion of the MAR order that was granted pursuant to N.C. Gen.Stat. § 15A-270(c). To understand
 
 Norman's
 
 holding, a short explanation of our post-conviction DNA testing statutes is necessary.
 

 When certain criteria are met, criminal defendants in North Carolina may move for post-conviction DNA testing of biological evidence. N.C. Gen.Stat. § 15A-269 (2013). If a trial court denies a "defendant's motion
 
 *203
 
 for DNA testing [,]" the defendant may appeal that order.
 

 Id.
 

 § 15A-270.1. When the trial court grants a defendant's motion for DNA testing, it must conduct a hearing on the results.
 

 Id.
 

 § 15A-270(a) ("upon receiving the results of the DNA testing conducted under G.S. 15A-269, the court shall conduct a hearing to evaluate the results and to determine if the results are unfavorable or favorable to the defendant."). If the test results "are unfavorable to the defendant, the court shall dismiss the motion...."
 

 Id.
 

 § 15A-270(b). However, if the DNA testing reveals evidence which is "favorable" to the defendant, "the court shall enter any order that serves the interests of justice, including [one] that ... (1) [v]acates and sets aside the judgment [,] (2) [d]ischarges the defendant[,] (3) [r]esentences the defendant[, or] (4) [g]rants a new trial."
 

 Id.
 

 § 15A-270(c).
 

 In
 
 Norman,
 
 the trial court granted the defendant's motion for DNA testing and conducted a hearing on the results, which the court determined were unfavorable to the defendant.
 
 202 N.C.App. at 330
 
 ,
 
 688 S.E.2d at 513-14
 
 . As a result, the defendant's motion was dismissed pursuant to subsection 15A-270(b).
 
 Id.
 
 at 331,
 
 688 S.E.2d at 514
 
 . On appeal, this Court concluded that although section 15A-270.1 provided a right to appeal from the denial of a motion for DNA testing, the defendant had no right to appeal "from an order denying relief following a hearing to evaluate the test results."
 
 Id.
 
 at 332,
 
 688 S.E.2d at 515
 
 . The
 
 Norman
 
 Court presumed that "[i]f the legislature intended to provide a right to appeal from the trial court's ruling on the results of DNA testing, ... it would have stated as such."
 

 Id.
 

 Here, defendant contends that "the State has no more right to appeal from a determination that the DNA results were 'favorable' and ordering a new trial, than [the defendant in
 
 Norman
 
 ] did from a determination that the results were 'unfavorable.' " Defendant insists that even if the trial court erred in granting him a new trial based on newly discovered evidence, he will receive a new trial anyway because the State has no independent statutory right to appeal the portion of the court's MAR order granting defendant relief on the basis of favorable post-conviction DNA tests results pursuant to subsection 15A-270(c). In other words, defendant argues that the State's appeal under subdivision 15A-1445(a)(2) is futile. We disagree. In fact, defendant had no statutory right to bring his claim for relief under our post-conviction DNA testing statutes in his MAR.
 

 *794
 
 As noted above, defendant filed his MAR pursuant to subsection 15A-270(c) (post-conviction DNA results), subsection 15A-1415(c) (newly discovered evidence) and subdivision 15A-1415(b)(3)
 

 *204
 
 (constitutional violations based upon the newly discovered evidence). The trial court granted him a new trial based on all of those grounds. "According to [subsection] 15A-1415(b), a convicted criminal defendant is entitled to seek relief from his or her convictions by means of [an MAR] filed more than ten days after the entry of judgment on certain specifically enumerated grounds."
 
 State v. Harwood,
 

 228 N.C.App. 478
 
 , 484,
 
 746 S.E.2d 445
 
 , 449 (2013). In
 
 Harwood,
 
 this Court recognized that because subsection 15A-1415(b)
 

 clearly provides that the eight specific grounds listed in that statutory subsection are 'the only grounds which the defendant may assert by a[n MAR] made more than [ten] days after the entry of judgment,' a trial court has no authority to grant a request for relief from a criminal conviction based upon a request made more than ten days after the entry of judgment unless the defendant's request falls within one of the eight categories specified in [subsection] 15A-1415(b)."
 

 Id.
 

 at 484
 
 ,
 
 746 S.E.2d at 450
 
 (quoting N.C. Gen.Stat. § 15A-1415(b) ). "For that reason, a trial court lacks jurisdiction over the subject matter of a claim for post[-]conviction relief which does not fall within one of the categories specified in [subsection] 15A-1415(b)."
 

 Id.
 

 (citations omitted). Our review of subsection 15A-1415(b) reveals that defendant's constitutional claims were cognizable under subdivision 15A-1415(b)(3). Defendant was also permitted to file an MAR and seek relief on newly discovered evidence grounds pursuant to subsection 15A-1415(c). However, defendant's claim requesting the trial court to grant relief pursuant to subsection 15A-270(c) could not be brought in his MAR, which was filed well past ten days after the entry of judgment upon his convictions. Indeed, no provision of subsection 15A-1415(b) authorized the trial court to enter an order vacating defendant's original judgment and order a new trial on the basis of "favorable" post-conviction DNA test results. In other words, the trial court did not have subject matter jurisdiction to rule on defendant's claim for relief under our post-conviction DNA statutes. Consequently, that portion of the trial court's order granting such relief is void.
 
 State v. Daniels,
 

 224 N.C.App. 608
 
 , 617,
 
 741 S.E.2d 354
 
 , 361 (2012).
 

 This conclusion is in harmony with the fact that our Legislature has provided a specific procedural vehicle for asserting, and obtaining relief on, claims for relief based on post-conviction DNA testing.
 
 See
 
 N.C. Gen.Stat. §§ 15A-269, -270. That statutory scheme has already been
 
 *205
 
 discussed in detail above. Defendant should have requested relief pursuant to subsection 15A-270(c) in an independent proceeding, separate and apart from his MAR.
 
 [8]
 
 Accordingly, since
 
 all
 
 of the relief granted to defendant was inextricably linked to, and based on, what the court found to be newly discovered evidence, the State properly relied on subdivision 15A-1445(a)(2) as its ground for appellate review.
 
 Peterson,
 

 228 N.C.App. at 343
 
 ,
 
 744 S.E.2d at 157
 
 (holding that this Court had jurisdiction to review a trial court's ruling on an MAR that was based, in part, on newly discovered evidence).
 
 [9]
 
 Defendant's motion to dismiss is
 
 *795
 
 therefore denied and the State's (alternative) petition for writ of certiorari is dismissed, as it is unnecessary to confer jurisdiction on this Court.
 

 B.
 
 Evidentiary Hearing
 

 We now proceed to the State's contention that the trial court erred by failing to conduct an evidentiary hearing before granting defendant's MAR. According to the State, "[i]f defendant has properly supported the allegations of each claim in the MAR with relevant, admissible, factual, proffered evidence, and each claim has merit such that defendant would prevail on that claim if the evidence in the supporting affidavits is deemed credible by the trial court after hearing the evidence from defendant's witnesses, then defendant has at most met the threshold showing required to obtain an evidentiary hearing." For the reasons that
 
 *206
 
 follow, we conclude that the trial court improperly ruled on defendant's motion without conducting an evidentiary hearing.
 
 [10]
 

 We begin by briefly explaining the general nature of MARs and the characteristics of the order issued in the instant case. An MAR, which is created by statute, constitutes "a motion in the original cause[,] ... not a new proceeding." N.C. Gen.Stat. § 15A-1411(b) (2013). It "is a post-verdict motion (or a post-sentencing motion where there is no verdict) made to correct errors occurring prior to, during, and after a criminal trial."
 
 State v. Handy,
 

 326 N.C. 532
 
 , 535,
 
 391 S.E.2d 159
 
 , 160-61 (1990). Generally, all post-trial motions related to a defendant's trial must be brought under an MAR. N.C. Gen.Stat. § 15A-1411(c).
 

 Our Legislature has specifically characterized the MAR as a procedural vehicle for defendants to challenge their convictions and sentences.
 

 Id.
 

 § 15A-1412. To that end, North Carolina's MAR statutes provide a mechanism to assert multiple, different claims for post-conviction relief in one procedural device.
 
 See
 
 official comment to
 

 id.
 

 § 15A-1411. When a defendant asserts multiple claims in an MAR, the trial court is ultimately charged with evaluating each individual claim on the merits and under the applicable substantive law. As a result, the trial court also sits as the trier of fact during MAR proceedings.
 

 "Whether the trial court was required to afford defendant an evidentiary hearing is primarily a question of law subject to
 
 de novo
 
 review."
 
 State v. Marino,
 

 229 N.C.App. 130
 
 , 140,
 
 747 S.E.2d 633
 
 , 640 (2013) (italics added). The procedure governing MARs is set out in N.C. Gen.Stat. § 15A-1420, and subsection (c) contains directives regarding the trial court's duty to hold an evidentiary hearing:
 

 *207
 
 (c) Hearings, Showing of Prejudice; Findings.
 

 (1)
 
 Any party
 
 is entitled to a hearing on questions of law or fact arising from the motion ... unless the court determines that the motion is without merit. The court
 
 must determine,
 
 on the basis of these materials and the requirements of
 
 *796
 
 this subsection, whether an evidentiary hearing is required to resolve questions of fact....
 

 (3) The court must determine the motion without an evidentiary hearing when the motion and supporting and opposing information present only questions of law....
 

 (4) If the court cannot rule upon the motion without the hearing of evidence, it
 
 must conduct
 
 a hearing for the taking of evidence, and must make findings of fact....
 

 N.C. Gen.Stat. § 15A-1420(c) (2015) (emphasis added). "In an evidentiary hearing for appropriate relief where the judge sits without a jury the moving party has the burden of proving by the preponderance of the evidence every fact to support his motion."
 
 State v. Adcock,
 

 310 N.C. 1
 
 , 37,
 
 310 S.E.2d 587
 
 , 608 (1984) (citing N.C. Gen.Stat. § 15A-1420(c)(5) ). As explained in
 
 State v. McHone,
 
 "[u]nder subsection [15A-1420](c)(4), read in
 
 pari materia
 
 with subsections (c)(1) ... and (c)(3), an evidentiary hearing is
 
 required unless
 
 the motion presents assertions of fact which will entitle the defendant to no relief even if resolved in his favor, or the motion presents only questions of law[.]"
 
 348 N.C. 254
 
 , 258,
 
 499 S.E.2d 761
 
 , 763 (1998) (emphasis added).
 
 [11]
 

 An evidentiary hearing is not automatically required before a trial court grants a defendant's MAR, but such a hearing is the general procedure rather than the exception. Indeed,
 
 McHone
 
 dictates that an evidentiary hearing is mandatory unless summary denial of an MAR is proper, or the motion presents a pure question of law.
 

 In the instant case, although the State denied "each and every allegation of fact made by ... defendant except those facts supported by the record and those specifically admitted[,]" the trial court granted defendant's MAR based upon extensive findings of what it characterized as "undisputed facts." In its lengthy MAR order, the court routinely faulted
 
 *208
 
 the State for failing to present evidence in rebuttal of defendant's allegations. Implicit in the trial court's ruling was its view that, after all MAR materials had been received from defendant and the State, only questions of law remained.
 

 As a result, the trial court treated the MAR proceeding as a burden-shifting scheme. For example, when ruling on defendant's
 
 Brady
 
 claim, the trial court faulted, and even chastised, the State for failing to "tender any evidence by affidavit or otherwise that [the memo] was produced to [defendant] or his counsel."
 
 [12]
 
 Yet the defendant who seeks relief in an MAR "must show the existence of the asserted ground for relief." N.C. Gen.Stat. § 15A-1420(c)(6). By contrast, the opposing party-here, the State-is not required to "file affidavits or other documentary evidence" or rebut allegations contained in the motion.
 

 Id.
 

 § 15A-1420(b)(2). Defendant nevertheless embraced the trial court's approach at oral argument, asserting that the State neither disputed "many material facts" nor forecasted what an evidentiary hearing would produce. As the State suggests in its brief, the trial court's ruling looks more like a summary judgment,
 
 see
 
 N.C. Gen.Stat. § 1A-1, Rule 56(a), (b) (2013) (allowing for summary judgment by either party in a civil case), than one rendered within the confines of our MAR
 

 *797
 
 statutes.
 
 See
 
 id.
 

 § 15A-1412 ("The provision in this Article for the right to seek relief by [MAR] is procedural and is not determinative of the question of whether the moving party is entitled to the relief sought or to other appropriate relief."). The State was not required to forecast evidence; defendant was required to
 
 present
 
 evidence for the trial court's evaluation, which he did. The court's evaluation of the evidence, however, was inherently flawed. We agree with the State that as a general matter, unless an MAR presents only pure questions of law, the motion's principal purpose is to obtain an evidentiary hearing on a defendant's claims for relief.
 

 *209
 
 Our conclusion is supported by recent language from our Supreme Court in a decision that addressed the trial court's role at hearings on motions to suppress evidence:
 

 The trial judge who presides at a suppression hearing "sees the witnesses, observes their demeanor as they testify and by reason of his more favorable position, he is given the responsibility of discovering the truth." For this reason, our appellate courts treat findings of fact made by the trial court as "conclusive on appeal if they are supported by the evidence." "The logic behind this approach is clear. In this setting, the trial judge is better able than we at the appellate level to gauge the comportment of the parties ... and to discern the sincerity of their responses to difficult questions." But a trial court is in no better position than an appellate court to make findings of fact if it reviews only the cold, written record. We therefore reject an interpretation of [the statutes governing suppression motions] that would diminish the trial court's institutional advantages in the fact-finding process.
 

 State v. Bartlett,
 

 368 N.C. 309
 
 ,
 
 776 S.E.2d 672
 
 , 674-75 (2015) (citations omitted). These principles share equal application in this case, where the trial court sat as the post-conviction trier of fact. Here, the trial court was obligated to ascertain the truth by testing the supporting and opposing information at an evidentiary hearing where the adversarial process could take place. Instead of doing so, the court wove its findings together based, in part, on conjecture and, as a whole, on the cold, written record.
 

 Given the nature of defendant's asserted grounds for relief, the trial court was required to resolve conflicting questions of fact at an evidentiary hearing. Moss' affidavit illustrates this point. The trial court found that this recantation "by an important witness for the State" rendered Moss' trial testimony false and "undermined the credibility of the State's theory of the case." Consequently, the court concluded that it was newly discovered evidence.
 

 Pursuant to section 15A-1415(c), claims of newly discovered evidence may be based on recanted testimony. If a new trial is to be granted on such testimony, "1) the court [must be] reasonably well satisfied that the testimony given by a material witness is false, and 2) there [should be] a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at the trial."
 

 *210
 

 State v. Britt,
 

 320 N.C. 705
 
 , 715,
 
 360 S.E.2d 660
 
 , 665 (1987),
 
 superseded by statute on other grounds as stated in
 

 State v. Defoe,
 

 364 N.C. 29
 
 , 33-38,
 
 691 S.E.2d 1
 
 , 4-7 (2010).
 

 As to the first
 
 Britt
 
 requirement, the trial court's finding that Moss' repudiation of his pretrial statement rendered his trial testimony false is unsupported by the evidence. The testimony given by Jackson, Davis, Oliver, and Best, which was substantially similar to Moss', suggests that his testimony was true and that his recantation was not. Moss' affidavit does not explain why it was impossible for him to have been in all the places described in his statement. Furthermore, the circumstances under which Moss repudiated his statement-approximately 13 years after he gave it-are absent from the record: Did Moss recant on his own? Did defendant's post-conviction counsel or family members pressure Moss to do so? Did Moss wish to avoid giving further testimony at a new trial? Has Moss changed his tune on the recantation since executing the affidavit in 2004? This Court has previously found that such circumstances have a direct bearing on the veracity of a witness's testimony.
 
 See
 

 State v. Doisey,
 

 138 N.C.App. 620
 
 , 628,
 
 532 S.E.2d 240
 
 , 245-46 (2000) (affirming the trial
 
 *798
 
 court's denial of an MAR based on recanted testimony because the recanting witness testified, during the second hearing on the motion, that she repudiated her recantation and that "she signed the affidavit after being repeatedly questioned" by friends and family members of the defendant about the facts that led to his conviction).
 

 Since the trial court had no opportunity to evaluate Moss' specific reasons for his recantation and his demeanor in giving that explanation, it could not properly determine whether the recantation was genuine and whether the statement and relevant trial testimony were false. Moss should have been questioned about whether his recantation was truthful, or merely a product of defendant's direction as to what to state. Accordingly, an evidentiary hearing was required in order to assess the truthfulness of Moss' affidavit.
 
 See
 

 State v. Brigman,
 

 178 N.C.App. 78
 
 , 94-95,
 
 632 S.E.2d 498
 
 , 509 (2006) ("Based on the record before us, we cannot determine the veracity of [the recanting witness's] testimony. Nor can we discern whether there is reasonable possibility that a different result would have been reached at trial had [the witness's] testimony at trial been different or non-existent. Accordingly, we must remand the [MAR] based upon her alleged recantation to the trial court for an evidentiary hearing.").
 

 The record is replete with similar factual disputes, many of which the trial court purported to resolve in its findings of fact despite the lack of an evidentiary hearing. We will not address each one, since we are
 
 *211
 
 vacating the trial court's order and a new hearing will be held on remand followed by entry of a new order.
 

 All told, the trial court was presented with a broad range of post-conviction claims based on a large and unusual constellation of conflicting evidence. Most of defendant's claims, and by extension, the trial court's findings, relied heavily on affidavits-and inferences drawn from them-for support. Resolution of those claims necessarily required the trial court to make credibility determinations, which could not be done unless the evidence and witnesses were actually
 
 before
 
 the court. Furthermore, the North Carolina Rules of Evidence apply to post-conviction proceedings.
 
 See
 

 Adcock,
 

 310 N.C. at 37
 
 ,
 
 310 S.E.2d at 608
 
 ("In hearings before a judge sitting without a jury 'adherence to the rudimentary rules of evidence is desirable.... Such adherence invites confidence in the trial judge's findings.' ") (citation omitted);
 
 State v. Foster,
 

 222 N.C.App. 199
 
 , 202-03,
 
 729 S.E.2d 116
 
 , 118-19 (2012) ("If we were to adopt the State's position, then the Rules of Evidence would not apply to ... [MARs] in criminal cases.... Obviously, that cannot be the law.... [Therefore,] the Rules of Evidence apply to post-conviction DNA testing motions or proceedings."). Some of the trial court's findings of fact in the MAR order were based upon evidence which the State argues was inadmissible as hearsay, hearsay within hearsay, and third-party guilt evidence. Suffice it to say that, on remand, the trial court should base its determinations upon only competent evidence. For the reasons stated above, we conclude that the trial court erred by reaching the merits of defendant's MAR without conducting an evidentiary hearing.
 

 III. Conclusion
 

 Defendant has supported the allegations contained in his MAR with sufficient and potentially compelling evidence. However, under no circumstances did the information offered in support and opposition to the MAR present only undisputed facts and pure questions of law. Given the nature of defendant's post-conviction claims and the unusual collection of evidence offered in support of them, the trial court erred in failing to conduct an evidentiary hearing and make findings on the conflicting assertions before it granted the MAR and ordered a new trial.
 

 Accordingly, we vacate the trial court's order granting defendant's MAR and remand for an evidentiary hearing.
 

 VACATED AND REMANDED FOR AN EVIDENTIARY HEARING.
 

 Judges STROUD and TYSON concur.
 

 [1]
 

 Testimony at trial indicated that a gang of teen-age drug dealers known as the "New York Boys" operated in Few Gardens. Defendant proceeded at trial under the theory that the New York Boys were responsible for these crimes.
 

 [2]
 

 Best testified that Moss identified the male as defendant's brother, Kenny, but at trial, Moss claimed not to recall who the person was.
 

 [3]
 

 To provide context, we briefly outline the events that led to defendant being charged in this case. Defendant was arrested in Few Gardens around 7:30 a.m. on 27 November 1991 for trespassing and driving with a revoked license. While defendant was in custody, he told DPD Officer R.M. Davis that "Doris was his close friend," and emphasized that she had killed Nishonda before killing herself. Defendant was released later that morning; however, he was interviewed by Durham Police again during the afternoon of the 27th. While speaking with investigators, defendant stated that Doris sold drugs for the "Miami Boys" and claimed that he saw several individuals exiting the back of Doris' apartment after the fire had been set. Defendant was eventually released without charge. In June 1992, defendant was admitted to the hospital after being shot five times; allegedly, New York Boys gang members "King" and "O" were responsible for the shooting. Detective Dowdy interviewed defendant regarding O's involvement in two murders unrelated to defendant's shooting. During the interview, defendant stated that the New York Boys had murdered Doris and Nishonda. On 12 November 1992, after multiple witnesses implicated defendant in Doris and Nishonda's murders during interviews with investigators, defendant and his brother were arrested. Defendant was charged with two counts of first degree murder and one count of first degree arson. Harvey was charged only with arson, but that charge was dropped shortly after defendant's conviction.
 

 [4]
 

 We note that the copy of Moss' affidavit contained in the record is essentially illegible. However, we do not question the State's or defendant's representations regarding the affidavit's content.
 

 [5]
 

 The lab also tested sperm found in Nishonda's vaginal and rectal smears, which revealed a partial male profile. Defendant was excluded as the source and the profile did not match that of Jones. In addition, the partial profile from the unknown male was ineligible for a CODIS search.
 

 [6]
 

 The affidavit contained only Waller's account of his interview with Jones.
 

 [7]
 

 Defendant also argues that the State has no right to appeal an MAR granting relief on the ground of constitutional violations. We conclude that, under
 
 Peterson,
 
 this argument is without merit. Our Supreme Court's decision in
 
 State v. Stubbs
 
 also defeats this argument.
 
 368 N.C. 40
 
 ,
 
 770 S.E.2d 74
 
 , 75 (2015) (holding that this Court had subject matter jurisdiction to review the State's appeal from a trial court's order granting the defendant's MAR, which was based on a violation of his rights under the Eight Amendment to the U.S. Constitution).
 

 [8]
 

 Although we do not reach the merits of this appeal, if we did, nothing would preclude us from reviewing the same post-conviction DNA test results as newly discovered evidence: the DNA test results would be evaluated pursuant to subsection 15A-1415(c), which states the requirements that must be met before evidence may be characterized as "newly discovered"; at the same time, we would not apply subsection 15A-270(a)'s "favorable" or "unfavorable" analysis to the test results.
 

 [9]
 

 We note that our Supreme Court has recently held that this Court "has jurisdiction to hear an appeal by the State of an MAR when the defendant has won relief from the trial court."
 
 Stubbs,
 
 368 N.C. at ----,
 
 770 S.E.2d at 76
 
 . The Court also recognized that N.C. Gen.Stat. § 15A-1422(c)(3) expressly provides that a trial court's MAR ruling is subject to review by writ of certiorari.
 

 Id.
 

 Accordingly, after
 
 Stubbs,
 
 Rule 21 was amended and now reads in pertinent part: "[t]he writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review ... pursuant to [subdivision] 15A-1422(c)(3) of an order of the trial court
 
 ruling
 
 on a motion for appropriate relief." N.C.R.App. P. 21(a)(1) (emphasis added). Prior to the Supreme Court's decision in
 
 Stubbs,
 
 Rule 21 stated in pertinent part "[t]he writ of certiorari may be issued in appropriate circumstances by either appellate court ... for review pursuant to [subdivision] 15A-1422(c)(3) of an order of the trial court
 
 denying
 
 a motion for appropriate relief." N.C.R.App. P. 21(a)(1) (2013) (emphasis added). Given that this case is solely focused on newly discovered evidence, appellate jurisdiction must be analyzed under subdivision 15A-1445(a)(2) rather than subdivision 15A-1422(c)(3).
 

 [10]
 

 Although neither party cites this Court's decision in
 
 State v. Stukes,
 

 153 N.C.App. 770
 
 ,
 
 571 S.E.2d 241
 
 (2002), we find it necessary to briefly discuss it. In Stukes, the trial court granted the defendant's MAR and allowed him a new trial on all charges.
 
 Id.
 
 at 773,
 
 571 S.E.2d at 243
 
 . At the trial level, the State "affirmatively argued against the need for an evidentiary hearing" on the defendant's MAR.
 
 Id.
 
 at 774,
 
 571 S.E.2d at 244
 
 . On appeal, however, the State asserted that the trial court's decision not to hold such a hearing was error.
 
 Id.
 
 After concluding that the State had not preserved the issue for review, and noting that " '[a] defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct[,]' " this Court rejected the State's argument.
 

 Id.
 

 (quoting
 
 State v. Bruno,
 

 108 N.C.App. 401
 
 , 412,
 
 424 S.E.2d 440
 
 , 447 (1993) (citation omitted)).
 

 We find that
 
 Stukes
 
 has no application to the instant case, where the State simply argued-within the confines of the MAR statutes and applicable case law-that defendant's motion should be summarily denied and an evidentiary hearing was not required if the court could determine, based on the pleadings, that the motion was without merit.
 

 [11]
 

 In addition, "[a]n evidentiary hearing is not required when the motion is made in the trial court pursuant to G.S. 15A-1414, but the court may hold an evidentiary hearing if it is appropriate to resolve questions of fact." N.C. Gen.Stat. § 15A-1420(c)(2). This provision does not apply here, as defendant's MAR was made pursuant to section 15A-1415.
 

 [12]
 

 The court made this finding despite record evidence that: (1) the memo was found "in a bound package of materials that were part of the screening package," presumably a reference to the materials that the State allowed defendant's trial counsel to "screen" before trial; (2) Vann's affidavit specified only that he had no "independent recollection" that the memo had ever been turned over; and (3) in a 2014 interview with the Washington Post, Vann stated that while he would have "seen" and "used" the memo had it been turned over, he could not "say 'with 100 percent certainty' that [the prosecutor] never gave him the [document]." To prevail under
 
 Brady,
 
 a defendant must prove that favorable and material evidence was "actually suppressed."
 
 State v. Kilpatrick,
 

 343 N.C. 466
 
 , 471,
 
 471 S.E.2d 624
 
 , 627 (1996). In this instance, a conflict in the evidence regarding the suppression issue arose from the record itself.