CALABRIA, Judge.
 

 *304
 
 Juan Foronte McPhaul ("defendant") appeals from judgments entered upon jury verdicts finding him guilty of attempted first degree murder; assault with a deadly weapon with intent to kill inflicting serious injury ("AWDWIKISI"); robbery with a dangerous weapon; conspiracy to commit robbery with a dangerous weapon; and assault inflicting serious bodily injury. After careful review, we
 
 *298
 
 conclude that defendant received a fair trial, free from prejudicial error. However, because the trial court was not authorized to enter judgments and sentence defendant for two assaults based on the same underlying conduct, we vacate the trial court's assault inflicting serious bodily injury judgment in 13 CRS 954.
 

 I. Background
 

 Late in the evening on 3 August 2012, Domino's Pizza driver Tyler Lloyd ("Lloyd") delivered two pizzas and a box of chicken wings to a residence on O'Bannon Drive in Raeford, North Carolina. When Lloyd arrived, a man waiting on the porch of the residence told Lloyd that his cousin had placed the delivery order and would return momentarily to pay for the food. As Lloyd returned to his truck to wait, a second, larger man approached him from the yard. The men engaged in small talk beside Lloyd's truck while Lloyd waited for payment.
 

 After five minutes passed, Lloyd said that he needed to return to Domino's. The larger man offered to pay for the pizzas. However, when Lloyd reached into his truck for the food, he was hit on the head from behind and fell to the ground. When Lloyd attempted to stand, the larger man hit him in the right shin with a metal baseball bat, and Lloyd fell back to the ground. As Lloyd extended his arm to protect himself from another blow, the bat connected with his hand and struck him hard in the face. Lloyd blacked out. When he regained consciousness, Lloyd discovered the men, the food, and his cell phone were gone. Since he could not call law enforcement, Lloyd attempted to drive back to Domino's. Shortly after he started driving, however, Lloyd began to feel as though he might lose consciousness again, and he pulled over.
 

 When Lloyd failed to return to Domino's, at 12:34 a.m. on 4 August 2012, his manager called the Hoke County Sheriff's Department ("HCSD")
 

 *305
 
 to report the missing driver. Lloyd's manager provided the O'Bannon Drive address as the destination for his last delivery, and HCSD deputies canvassed the area. Although they did not find Lloyd, on the pavement, they discovered a pile of loose change; a 2011 Hoke County High School class ring; a Domino's Pizza delivery sticker; and a large pool of reddish-brown liquid that appeared to be fresh blood. The deputies contacted Detective Sergeant Donald E. Schwab, Jr. ("Detective Schwab") to request assistance with the investigation.
 

 At around 1:30 a.m. on 4 August 2012, HCSD deputies found Lloyd sitting in his truck, approximately one-quarter mile away from the O'Bannon Drive residence. Lloyd was very disoriented and was bleeding from severe lacerations to his head and right leg. When Detective Schwab arrived, Lloyd told him that two black males with dreadlocks, wearing black clothing, had stolen his cell phone and pizzas and beaten him with a metal baseball bat. Lloyd told Detective Schwab that one of the men was "larger framed" and the other man was "smaller framed [and] shorter." Emergency Medical Services subsequently arrived and transported Lloyd to the hospital, where he received emergency brain surgery for his injuries.
 

 At 3:45 a.m. on 4 August 2012, HCSD Captain John Kivett ("Captain Kivett") interviewed the Domino's manager regarding the details of the O'Bannon Drive delivery order. Subsequently, the manager obtained a printout confirming that the order was placed online. Domino's captured and provided the IP address to investigators.
 

 At approximately 4:00 a.m. on 4 August 2012, investigators conducted a canine track from the yard at the O'Bannon Drive residence. After tracking through a hole in the fence, the canine followed a dirt path into the adjacent neighborhood of Puppy Creek Mobile Home Park, where the canine lost the track at the nearby intersection of Springer Drive and Dalmatian Drive. That afternoon, investigators traced the IP address provided by Domino's to a residence on Springer Drive in the Puppy Creek Mobile Home Park.
 

 At 8:15 p.m. on 4 August 2012, Captain Kivett met with a confidential source of information ("CSI"). The CSI told Captain Kivett that at approximately 11:30 p.m. on 3 August 2012, he observed two men, wearing black shirts and blue jeans, running from the intersection of Springer Drive and Dalmatian
 
 *299
 
 Drive, heading toward 217 Springer Drive. The CSI described one of the men he saw as "a tall large frame black male [with] long dreadlocks," and the other as "a short slim black male with dreadlocks." In addition, one man was holding a cell phone, and the other man was carrying what appeared to be a large duffle bag, similar
 
 *306
 
 to the type used for pizza delivery. The larger man entered 217 Springer Drive through the front door, but the CSI lost sight of the smaller man when he disappeared behind another residence.
 

 At approximately 9:00 p.m. on 4 August 2012, Captain Kivett investigated the Springer Drive residence associated with the IP address used for the Domino's order. None of the occupants matched Lloyd's description of his assailants. However, Captain Kivett determined that the home's wireless connection was unsecured and accessible to any wireless device within range.
 

 With all of this information, Detective Schwab applied for a warrant for 217 Springer Drive, based upon probable cause that a search of the residence would yield evidence of Lloyd's assault. At 11:05 p.m. on 4 August 2012, HCSD obtained a search warrant for 217 Springer Drive. In executing the search warrant, HCSD seized two Domino's pizza boxes; a Domino's chicken wing box; printed Domino's delivery labels bearing the O'Bannon Drive address; a black OtterBox cell phone cover; a large black t-shirt; and various forms of identification establishing defendant as a resident of 217 Springer Drive. In addition, HCSD discovered an aluminum baseball bat underneath the residence next door.
 

 On 7 August 2012, HCSD arrested defendant and charged him with attempted first degree murder, AWDWIKISI, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. On 2 December 2013, a Hoke County grand jury returned bills of indictment formally charging defendant with these offenses, as well as assault inflicting serious bodily injury. Prior to trial, defendant filed a motion to suppress all evidence obtained from the search of his residence, claiming that the warrant lacked probable cause. Following an evidentiary hearing, the trial court denied defendant's motion.
 

 On 29 September 2015, a jury trial commenced in Hoke County Criminal Superior Court. Defendant moved to dismiss all charges at the close of the State's evidence and at the close of all of the evidence. The trial court denied both motions. On 2 October 2015, the jury returned verdicts finding defendant guilty of all charges. The trial court ordered defendant to serve the following consecutive sentences in the custody of the North Carolina Division of Adult Correction: 238-298 months for attempted first degree murder; 88-118 months for AWDWIKISI; and 97-129 months for robbery with a dangerous weapon. In addition, the trial court imposed concurrent sentences of 38-58 months for conspiracy to commit robbery with a dangerous weapon and 25-39 months for assault inflicting serious bodily injury. Defendant appeals.
 

 *307
 

 II. Analysis
 

 A. Denial of Defendant's Motion to Suppress
 

 Defendant first challenges the trial court's denial of his motion to suppress, contending that the search warrant affidavit failed to establish the existence of probable cause. We disagree.
 

 Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982). We review the trial court's conclusions of law
 
 de novo
 
 .
 
 State v. Hughes
 
 ,
 
 353 N.C. 200
 
 , 208,
 
 539 S.E.2d 625
 
 , 631 (2000).
 

 The protection against unreasonable searches and seizures is ingrained within our federal and state constitutions.
 
 See
 
 U.S. Const. amend. IV (protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and providing that "no warrants shall issue but upon probable cause, supported by oath or affirmation
 
 *300
 
 and particularly describing the place to be searched and the persons or things to be seized"); N.C. Const. Art. I sec. 20 (prohibiting the issuance of "[g]eneral warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence").
 

 In light of these provisions, courts "have expressed a strong preference for searches conducted pursuant to a warrant."
 
 State v. McKinney
 
 ,
 
 368 N.C. 161
 
 , 164,
 
 775 S.E.2d 821
 
 , 824 (2015) (citations and internal quotation marks omitted). Pursuant to N.C. Gen. Stat. § 15A-244 (2015), all search warrant applications must be made in writing upon oath or affirmation and must contain:
 

 (1) The name and title of the applicant; and
 

 (2) A statement that there is probable cause to believe that items subject to seizure under [N.C. Gen. Stat. §] 15A-242 may be found in or upon a designated or described place, vehicle, or person; and
 

 (3) Allegations of fact supporting the statement. The statements must be supported by one or more affidavits
 
 *308
 
 particularly setting forth the facts and circumstances establishing probable cause to believe that the items are in the places or in the possession of the individuals to be searched; and
 

 (4) A request that the court issue a search warrant directing a search for and the seizure of the items in question.
 

 The facts set forth in the affidavit "must be such that a reasonably discreet and prudent person would rely upon them before they will be held to provide probable cause justifying the issuance of a search warrant."
 
 State v. Arrington
 
 ,
 
 311 N.C. 633
 
 , 636,
 
 319 S.E.2d 254
 
 , 256 (1984).
 

 "The 'common-sense, practical question' of whether probable cause exists must be determined by applying a 'totality of the circumstances' test."
 
 State v. Benters
 
 ,
 
 367 N.C. 660
 
 , 664,
 
 766 S.E.2d 593
 
 , 597 (2014) (quoting
 
 Illinois v. Gates
 
 ,
 
 462 U.S. 213
 
 , 230,
 
 103 S.Ct. 2317
 
 , 2328,
 
 76 L.Ed.2d 527
 
 , 543 (1983) ). In making this determination,
 

 [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.
 

 Id.
 
 at 664,
 
 766 S.E.2d at 598
 
 (citation omitted). The "standard for determining probable cause is flexible, permitting the magistrate to draw reasonable inferences from the evidence in the affidavit supporting the application for the warrant...."
 
 McKinney
 
 ,
 
 368 N.C. at 164
 
 ,
 
 775 S.E.2d at 824-25
 
 (internal citations and quotation marks omitted). The "evidence is viewed from the perspective of a police officer with the affiant's training and experience, and the commonsense judgments reached by officers in light of that training and specialized experience[.]"
 
 Id.
 
 at 164-65,
 
 775 S.E.2d at 825
 
 (citations omitted).
 

 A magistrate's probable cause determination is accorded great deference, and "after-the-fact scrutiny should not take the form of a
 
 de novo
 
 review."
 
 Arrington
 
 ,
 
 311 N.C. at 638
 
 ,
 
 319 S.E.2d at 258
 
 . "Instead, a reviewing court is responsible for ensuring that the issuing magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed."
 
 McKinney
 
 ,
 
 368 N.C. at 165
 
 ,
 
 775 S.E.2d at 825
 
 (quoting
 
 Gates
 
 ,
 
 462 U.S. at 238-39
 
 ,
 
 103 S.Ct. at 2332-33
 
 ,
 
 76 L.Ed.2d at 548
 
 (alterations in original)). Nevertheless,
 
 *309
 
 "[b]ecause its duty in ruling on a motion to suppress based upon an alleged lack of probable cause for a search warrant involves an evaluation of the judicial officer's decision to issue the warrant, the trial court should consider only the information before the issuing officer."
 
 State v. Brown
 
 , --- N.C. App. ----, ----,
 
 787 S.E.2d 81
 
 , 85 (2016).
 

 On appeal, defendant argues that the warrant lacked probable cause because the CSI's statement provided the only basis to believe that evidence might be found at 217 Springer Drive, and the supporting affidavit failed to establish the unnamed CSI's reliability. We disagree.
 

 *301
 
 "When probable cause is based on an informant's tip a totality of the circumstances test is used to weigh the reliability or unreliability of the informant."
 
 State v. Green
 
 ,
 
 194 N.C. App. 623
 
 , 627,
 
 670 S.E.2d 635
 
 , 638,
 
 aff'd per curiam
 
 ,
 
 363 N.C. 620
 
 ,
 
 683 S.E.2d 208
 
 (2009). Courts consider several factors in assessing reliability, including: "(1) whether the informant was known or anonymous, (2) the informant's history of reliability, and (3) whether information provided by the informant could be and was independently corroborated by the police."
 

 Id.
 

 (citation omitted).
 

 In the instant case, Detective Schwab's affidavit included the following details concerning the CSI:
 

 On August 4, 2012 at approximately 8:15 PM Captain John Kivett met with a confidential source of information hereafter referred to as CSI. The CSI provided information indicating that on August 3, 2012 at approximately 11:30 PM he witnessed two black males, wearing black shirts, and blue jeans running from near the intersection of Springer Drive and Dalmatian Drive Raeford North Carolina heading toward 217 Springer Drive Raeford North Carolina. He described one of the black males as a tall large frame black male long dreadlocks and the other was a short slim black male with dreadlocks. One of the black males was carrying what appeared to him as a large duffel [sic] bag and the other black male was carrying what appeared to him as a cell phone in his hand. The smaller framed black male disappeared from his sight behind [another Springer Drive residence]. The CSI witnessed the larger framed black male walking inside the front door of 217 Springer Drive Raeford North Carolina.
 

 At the suppression hearing, the trial court considered additional evidence concerning the CSI's identity, address, and source of information. Captain Kivett testified that he interviewed the CSI after the individual
 
 *310
 
 heard about Lloyd's assault and volunteered information to HCSD. Detective Schwab testified that he did not include the CSI's identity in the affidavit because the individual feared retaliation and requested anonymity.
 

 In the suppression order, the trial court found that Detective Schwab identified the informant as a CSI in the affidavit "to protect the security and welfare" of the individual. However, this information was not before the magistrate, and "it is error for a reviewing court to 'rely[ ] upon facts elicited at the [suppression] hearing that [go] beyond the four corners of the warrant.' "
 
 Brown
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 85
 
 (alterations in original) (quoting
 
 Benters
 
 ,
 
 367 N.C. at 673
 
 ,
 
 766 S.E.2d at
 
 603 );
 
 see also
 

 id.
 

 at ----,
 
 787 S.E.2d at 87
 
 (holding that the trial court erred in considering the detective's suppression "hearing testimony about what he intended the affidavit to mean-evidence outside the four corners of the affidavit and not recorded contemporaneously with the magistrate's consideration of the application-in determining whether a substantial basis existed for the magistrate's finding of probable cause"). Nevertheless, we conclude that defendant was not prejudiced by the trial court's error, because the affidavit contained sufficient information from which the magistrate could reasonably infer that the CSI was reliable.
 
 McKinney
 
 ,
 
 368 N.C. at 165
 
 ,
 
 775 S.E.2d at 824-25
 
 .
 

 "[A]n officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge."
 

 Id.
 

 (citation and quotation marks omitted). Here, the affidavit indicates that the CSI's statement corroborated significant matters previously known to HCSD, including the general time and location of the offenses; Lloyd's physical description of his assailants; and the suspects' possession of items similar in appearance to those stolen from Lloyd. The affidavit, therefore, demonstrated the CSI's reliability because it established that "information provided by the informant
 
 could be and was independently corroborated by the police
 
 ."
 
 Green
 
 ,
 
 194 N.C. App. at 627
 
 ,
 
 670 S.E.2d at 638
 
 (emphasis added). Although defendant complains that the trial court did not specifically find that the CSI was reliable, he concedes that the court found that the CSI's information was
 

 *302
 
 independently corroborated by the statement of the victim[,] by the results of the dog track[,] and by the results of the investigation of the internet IP address used to place an order with Domino's Pizza, as well as the close proximity of [the Springer Drive residence associated with the IP address provided by Domino's] to 217 Springer Drive, the place which is the subject of the application for the issuance of a search warrant.
 

 *311
 
 This finding is supported by competent evidence, and therefore, is conclusively binding on appeal.
 
 Cooke
 
 ,
 
 306 N.C. at 134
 
 ,
 
 291 S.E.2d at 619
 
 .
 

 Defendant asserts that the instant case is analogous to
 
 State v. Benters
 
 ,
 
 367 N.C. 660
 
 ,
 
 766 S.E.2d 593
 
 (2014). In
 
 Benters
 
 , a detective met with a "confidential and reliable source" who informed him about the existence, location, and owner of an alleged indoor marijuana growing operation.
 

 Id.
 

 at 662
 
 ,
 
 766 S.E.2d at 596
 
 . Following an investigation, officers obtained and executed a search warrant for the property, where they seized 55 marijuana plants, various growing supplies, multiple firearms, and $1,540 in cash.
 

 Id.
 

 at 663
 
 ,
 
 766 S.E.2d at 597
 
 . After the defendant successfully moved to suppress the evidence, the State appealed, and a divided panel of this Court affirmed.
 
 See generally
 

 State v. Benters
 
 ,
 
 231 N.C. App. 295
 
 ,
 
 750 S.E.2d 584
 
 (2013).
 

 Our Supreme Court affirmed the State's appeal. In assessing the sufficiency of the affidavit, the Court held that the detective's source was an anonymous informant, notwithstanding the affiant's description of the individual as a "confidential and reliable source of information."
 
 Benters
 
 ,
 
 367 N.C. at 669
 
 ,
 
 766 S.E.2d at 600
 
 . The Court explained that because the informant's "tip, as averred, amount[ed] to little more than a conclusory rumor," the State was "not entitled to any great reliance on it[, and] the officers' corroborative investigation" was required to "carry more of the State's burden to demonstrate probable cause."
 

 Id.
 

 The Court ultimately concluded that under the totality of the circumstances,
 

 the officers' verification of mundane information, Detective Hastings's statements regarding defendant's utility records, and the officers' observations of defendant's gardening supplies are not sufficiently corroborative of the anonymous tip or otherwise sufficient to establish probable cause, notwithstanding the officers' professional training and experience. Furthermore, the material allegations set forth in the affidavit are uniformly conclusory and fail to provide a substantial basis from which the magistrate could determine that probable cause existed.
 

 Id.
 

 at 673
 
 ,
 
 766 S.E.2d at 603
 
 .
 

 The instant case is distinguishable. Unlike
 
 Benters
 
 , where an informant's conclusory and uncorroborated tip
 
 initiated
 
 the criminal investigation,
 
 see
 

 id.
 

 at 669
 
 ,
 
 766 S.E.2d at 600
 
 , here, HCSD's independent investigation was already well underway when Captain Kivett met with the CSI. More importantly, the information corroborated by HCSD was neither "mundane,"
 

 id.
 

 at 673
 
 ,
 
 766 S.E.2d at 603
 
 , nor "qualitatively
 
 *312
 
 and quantitatively deficient,"
 

 id.
 

 at 661
 
 ,
 
 766 S.E.2d at 595
 
 . Rather, the CSI's statement was independently corroborated by essential portions of HCSD's existing investigation, including the results of the dog track; Lloyd's description of the suspects and the stolen items; and the proximity of 217 Springer Drive to the residence associated with the IP address provided by Domino's.
 

 Moreover, although the CSI provided the only evidence pointing law enforcement to 217 Springer Drive, "such a citizen complaint is not necessarily reviewed in isolation."
 
 McKinney
 
 ,
 
 368 N.C. at 165
 
 ,
 
 775 S.E.2d at 825
 
 (upholding a search warrant where the supporting affidavit demonstrated that "[t]he officer's direct observations were ... consistent with the citizen's information"). Here, the affidavit indicates that after speaking with the CSI, Captain Kivett investigated the Springer Drive residence associated with the IP address provided by Domino's. Although none of the residents matched Lloyd's description of his attackers, Captain Kivett discovered that the wireless routing system was unsecured, and therefore, "anybody in the immediate area would be able to use the internet service."
 

 *303
 
 In addition, the affidavit alleges that "[t]here is more than a fair probability the pizza boxes will still be inside or on the curtilage of 217 Springer Drive ... [because t]rash services have not collected trash from this residence since the offense occurred." This statement demonstrates the officers' urgent need to obtain a search warrant before crucial evidence might be lost, particularly given that the offenses, investigation, and warrant application all occurred within 24 hours.
 
 See
 

 id.
 
 at 164,
 
 775 S.E.2d at 824
 
 ("Recognizing that affidavits attached to search warrants are normally drafted by nonlawyers in the haste of a criminal investigation, courts are reluctant to scrutinize them in a hypertechnical, rather than a commonsense, manner[.]" (citations and internal quotation marks and ellipsis omitted)).
 

 We hold that based on the totality of the circumstances, the affidavit provided a substantial basis for the reviewing magistrate to conclude that probable cause existed to justify issuing a search warrant for 217 Springer Drive. The affidavit contained sufficient facts demonstrating the reliability of the CSI's information, most of which was previously and independently corroborated by HCSD's own thorough investigation. Furthermore, the affidavit provided a detailed, chronological summary of HCSD's rapidly unfolding investigation and established the urgent need to obtain a search warrant before critical evidence might be destroyed.
 

 The trial court's findings of fact are supported by competent evidence and, in turn, support the court's conclusion that Detective Schwab's
 
 *313
 
 affidavit provided a substantial basis for the magistrate to determine that probable cause existed. Therefore, we conclude that the trial court did not err by denying defendant's motion to suppress.
 

 B. Latent Fingerprint Testimony
 

 Defendant next argues that the trial court erred by allowing the State's expert witness to testify that latent fingerprints found on Lloyd's truck and on evidence seized during the search of 217 Springer Drive matched defendant's known fingerprint impressions. We agree.
 

 We review a trial court's ruling on the admissibility of expert testimony for abuse of discretion.
 
 State v. McGrady
 
 ,
 
 368 N.C. 880
 
 , 893,
 
 787 S.E.2d 1
 
 , 11 (2016). "[A] trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision."
 

 Id.
 

 (citation omitted).
 

 In 2011, the General Assembly amended N.C.R. Evid. 702 to adopt "the federal standard for the admission of expert witness testimony articulated in the
 
 Daubert
 
 line of cases."
 
 Id.
 
 at 884, 787 S.E.2d at 5. Pursuant to amended N.C. Gen. Stat. § 8C-1, Rule 702(a),
 

 (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 Subsections (1)-(3) compose the three-pronged reliability test which is new to the amended rule.
 
 McGrady
 
 , 368 N.C. at 890, 787 S.E.2d at 9. "The precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony. In each case, the trial court has discretion in determining how to address the three prongs of the reliability test."
 
 Id.
 
 The primary focus should be "the reliability of the witness's principles and methodology, not ... the conclusions that they generate[.]"
 
 Id.
 
 (citations and quotation marks omitted). "However, conclusions and methodology are not entirely distinct from
 
 *314
 
 one another[.]"
 
 Id.
 
 Accordingly, "when a trial court concludes that there is simply too great an analytical gap between the data and the opinion proffered, the court is not required to admit opinion
 
 *304
 
 evidence that is connected to existing data only by the
 
 ipse dixit
 
 of the expert."
 
 Id.
 

 In the instant case, Trudy Wood ("Wood"), the State's witness, testified that she has worked as a latent fingerprint examiner for the Fayetteville Police Department since December 2007. According to Wood, each unique fingerprint contains distinguishing characteristics called "minutia," or "Galton points." Wood testified that it is possible to identify the source of a latent print by comparing the latent print with an individual's "known impressions" and evaluating similarities between the prints' minutia points.
 

 Defendant did not object to the State's tender of Wood as an expert in fingerprint identification. However, defendant repeatedly objected to the foundation for Wood's opinion testimony and its admission pursuant to Rule 702(a). Defendant renews those challenges on appeal.
 

 Wood explained the examination procedure that she uses in determining whether a latent fingerprint matches a particular individual's known impressions. First, Wood identifies the latent print's pattern type and determines whether the print was formed by a finger or a palm. If the print contains sufficient identifiable minutia points, Wood compares the print against the individual's known impressions. She performs the examination under an optic camera, which allows her to enlarge the minutia points and view the prints side by side. Wood explained how she uses this procedure to ultimately conclude whether the prints were formed by the same individual:
 

 [THE STATE:] But when you have a print, you cannot tell right off the bat which of the four fingers it would be or maybe the thumb as well. How do you reach a conclusion as to a finger? How do you arrive at that finger for comparison?
 

 [WOOD:] Again, it depends on the pattern type. If the latent print is a swirl, then on the known print of the individual, I'm only looking at the swirls, if he has arches and swirls, but my latent is a swirl. I'm not going to look at the arches of his fingers. I'm going to look at the swirls because I'm comparing the swirl pattern to another swirl pattern.
 

 ...
 

 *315
 
 [THE STATE:] At what point are you able to-when you're looking at two prints side by side, are you able to make an identification that they match?
 

 [WOOD:] When I believe there's enough sufficient characteristics and sequence of the similarities.
 

 Q. Can there be an identification if any portion of a fingerprint does not match the latent?
 

 A. If the similarity can be explained, a lot of times when a latent print is lifted, you have distortion which basically can be as simply as someone's hand moving when they're touching an item. If that can be explained, then an identification can still be rendered.
 

 Q. As you prepare and conduct a side-by-side comparison, are you likewise able to exclude certain fingerprints, known impressions as a contributor to the latent print?
 

 A. Yes, we can. We have identification, we have exclusion and we have inconclusive, are the three terms that we use.
 

 Wood testified that she uses the same examination technique as is commonly used in the field of latent print identification, and she employed this procedure while conducting her examination in this case. However, when Wood testified to her ultimate conclusions, she was unable to establish that she reliably applied the procedure to the facts of this case:
 

 [THE STATE:] As to State's 35-A in Item 113, can you again demonstrate to the Jury the comparison between 35-A and 113?
 

 [WOOD:] State's Exhibit 35-A is a latent print from the driver's door and it contains the left index finger of a fingerprint card bearing the name of [defendant].
 

 Q. And upon what is that conclusion based?
 

 A. My training and experience.
 

 Q. In looking at the individual minutia with those two fingerprints; is that correct?
 

 A. That's correct, the process I explained earlier.
 

 ...
 

 *305
 

 *316
 
 [THE STATE:] Item 109-A and 113, can you again demonstrate to the Jury what comparison those impressions are based on your examination?
 

 [WOOD:] State's Exhibit 109-A from the Domino's chicken wing box, letter A, is identified as the right middle finger compared to the fingerprint card bearing the name of [defendant].
 

 Q. Is your conclusion, again, based upon the same procedure you described to the Jury?
 

 A. That's correct.
 

 Q. Looking for the striated minutia in that fingerprint and that latent print?
 

 A. That's correct.
 

 Pursuant to Rule 702(a)(3), this testimony is insufficient. To satisfy Rule 702 's three-pronged reliability test, an expert witness must be able to explain not only the abstract methodology underlying the witness's opinion, but also that the witness reliably applied that methodology to the facts of the case. Wood previously testified that during an examination, she compares the pattern type and minutia points of the latent print and known impressions until she is satisfied that there are "sufficient characteristics and sequence of the similarities" to conclude that the prints match. However, Wood provided no such detail in testifying how she arrived at her actual conclusions
 
 in this case
 
 . Without further explanation for her conclusions, Wood implicitly asked the jury to accept her expert opinion that the prints matched. Since Wood failed to demonstrate that she "applied the principles and methods reliably to the facts of the case," as required by Rule 702(a)(3), we hold that the trial court abused its discretion by admitting this testimony.
 

 Nevertheless, "[a]n error is not prejudicial unless there is a reasonable probability that, had the error in question not been committed, a different result would have been reached at trial."
 
 State v. Babich
 
 , --- N.C. App. ----, ----,
 
 797 S.E.2d 359
 
 , 364 (2017). Defendant contends that absent Wood's testimony, there was a reasonable probability that the jury would have found him not guilty, because Lloyd could not identify defendant as his attacker, and the fingerprint testimony was the only evidence that tied defendant to the actual crime scene. We disagree.
 

 The State presented abundant additional evidence to assist the jury, including: HCSD's seizure, during the lawful search of defendant's home,
 
 *317
 
 of items matching the description of Lloyd's stolen property; the aluminum bat discovered underneath an immediately adjacent residence; the close proximity between defendant's residence and the unsecured wireless network used to place the Domino's order; and the similarity between the descriptions of the suspects that Lloyd and the CSI independently provided to HCSD. Although Lloyd was unable to positively identify defendant as one of his attackers, defendant's booking photograph was admitted into evidence, and Detective Schwab testified that it was "a fair and accurate depiction" of defendant's appearance on the date of his arrest. In light of all of the evidence pointing to defendant's guilt, we conclude that he was not prejudiced by the erroneous admission of Wood's expert testimony.
 
 See
 

 id.
 

 at ----,
 
 797 S.E.2d at 365
 
 (holding that the defendant was not prejudiced by the trial court's erroneous admission of testimony from the State's expert in retrograde extrapolation, because "even without the challenged expert testimony, there [wa]s no reasonable possibility that the jury would have reached a different result").
 

 C. Assault Convictions
 

 Defendant's final argument is that the trial court erred by entering judgments and imposing sentences for AWDWIKISI and assault inflicting serious bodily injury, because the same underlying conduct formed the basis for both offenses. We agree.
 

 "[W]hen a trial court acts contrary to a statutory mandate, the defendant's right to appeal is preserved despite the defendant's failure to object during trial."
 
 State v. Jamison
 
 ,
 
 234 N.C. App. 231
 
 , 237,
 
 758 S.E.2d 666
 
 , 671 (2014) (citation omitted). We review issues of statutory construction
 
 de novo
 
 .
 
 Id.
 
 at 238,
 
 758 S.E.2d at 671
 
 .
 

 *306
 
 In North Carolina, assault inflicting serious bodily injury and AWDWIKISI are statutory crimes. "Unless the conduct is covered under some other provision of law providing greater punishment," a person who commits assault inflicting serious bodily injury is guilty of a Class F felony.
 
 N.C. Gen. Stat. § 14-32.4
 
 (a). We have held that the inclusion of this prefatory clause indicates "that the legislature intended that § 14-32.4 apply only in the absence of other applicable provisions."
 
 State v. Ezell
 
 ,
 
 159 N.C. App. 103
 
 , 109,
 
 582 S.E.2d 679
 
 , 684 (2003). Pursuant to
 
 N.C. Gen. Stat. § 14-32
 
 (a), "[a]ny person who assaults another person with a deadly weapon with intent to kill and inflicts serious injury" is guilty of a Class C felony.
 

 Furthermore, ''[i]n order for a defendant to be charged with multiple counts of assault, there must be multiple assaults.''
 

 *318
 

 State v. McCoy
 
 ,
 
 174 N.C. App. 105
 
 , 115,
 
 620 S.E.2d 863
 
 , 871 (2005). ''This requires evidence of a distinct interruption in the original assault followed by a second assault.''
 

 Id.
 

 (citation and quotation marks omitted).
 

 In the instant case, defendant's convictions for AWDWIKISI and assault inflicting serious bodily injury are based on the same underlying conduct, to wit: the 3 August 2012 assault of Tyler Lloyd. There is no evidence of a "distinct interruption" in the assault.
 

 Id.
 

 According to the plain language in
 
 N.C. Gen. Stat. § 14-32.4
 
 (a), the trial court was not authorized to enter judgment and sentence defendant for assault inflicting serious bodily injury, because AWDWIKISI imposes greater punishment for the same conduct.
 
 See
 

 State v. Davis
 
 ,
 
 364 N.C. 297
 
 , 306,
 
 698 S.E.2d 65
 
 , 70 (2010) (vacating the trial court's judgments for felony death by vehicle and felony serious injury by vehicle, because the court was not authorized to impose sentences for those offenses when the defendant's convictions for second degree murder and assault with a deadly weapon inflicting serious injury "impose greater punishment for the same conduct"). Therefore, we vacate the trial court's judgment in 13 CRS 954 entered upon the jury's verdict finding defendant guilty of assault inflicting serious bodily injury.
 

 III. Conclusion
 

 Based on the totality of the circumstances, Detective Schwab's warrant application and supporting affidavit provided a substantial basis for the magistrate to conclude that probable cause existed to justify issuing a warrant authorizing a search of 217 Springer Drive. Although the trial court erred by admitting testimony from the State's expert in fingerprint identification, defendant was not prejudiced by the error. Because defendant's conduct was "covered under some other provision of law providing greater punishment," the trial court was not authorized to impose punishment for assault inflicting serious bodily injury, and therefore, we vacate the trial court's judgment in 13 CRS 954.
 

 NO PREJUDICIAL ERROR IN PART; VACATED IN PART.
 

 Judges STROUD and TYSON concur.