IN THE COURT OF APPEALS OF NORTH CAROLINA

2023-NCCOA-6

No. COA22-48

Filed 17 January 2023

Mecklenburg County, Nos. 18 CRS 5401, 18 CRS 5402, 18 CRS 5403

STATE OF NORTH CAROLINA

v.

JORDAN MONTEZ GRAHAM

Appeal by defendant from judgment entered 21 May 2021 by Judge W. Robert Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 21 September 2022.

*Attorney General Joshua H. Stein, by Special Attorney General Tamara M. Van Pala Skrobacki, for the State.*

*Daniel J. Dolan and Appellate Defender Glenn G. Gerding for Defendant-Appellant.*

CARPENTER, Judge.

Defendant appeals from judgment after a jury convicted him of felonious breaking or entering, larceny after breaking or entering, and attaining the status of habitual breaking and entering offender. On appeal, Defendant argues: (1) the trial court prejudicially erred when it instructed the jury "[t]he State will present evidence relating to previous convictions" during the habitual status offender phase of trial; (2) the trial court committed plain error by admitting expert testimonies without

establishing the necessary foundation for reliability under Rule 702; and (3) the case should be remanded for correction of a clerical error on the written judgment relating to the felony class of the habitual breaking and entering status offense. After careful review, we find no prejudicial error.

## I. Factual & Procedural Background

The State's evidence at trial tends to show the following: On 16 June 2016 at approximately 5:30 p.m., Marie Broz ("Broz") left her Charlotte home to take three of her children to track practice, leaving her oldest daughter, A.B., alone in the house. Broz received two phone calls from A.B. while Broz was gone. In her first call, A.B. told Broz that she thought she heard footsteps in the home. Broz confirmed to A.B. that Broz and the other children were not inside the house. Before calling Broz again, A.B. stepped out of her bedroom and noticed a window was broken, and the back door was open. In her second call, A.B. told Broz that she believed the home had been broken into. Broz instructed A.B. to call the police. Blood was found on the shattered glass, blinds, and floor. Additionally, fingerprints were left on the window frame. A PlayStation and other gaming equipment belonging to Broz's son were found to be missing from the home.

Shortly after 10:00 p.m. that evening, James Pease ("Pease"), a crime scene investigator for the Charlotte-Mecklenburg Police Department ("CMPD"), responded

to Broz's home to investigate the residential breaking and entering and larceny. Pease testified that he gathered photographs of the residence and collected latent evidence, including fingerprints; suspected biological evidence, including blood; and physical evidence, including a shovel and hair from a bucket, which was used to prop open the rear screen door. Pease dusted for and found fingerprints on the frame of the broken window—the suspected point of entry.

¶ 4        Aaron Partridge ("Partridge"), a detective for CMPD, was assigned to investigate the case. Defendant became a suspect in the investigation after Partridge received "a DNA comparison result back [from the crime lab] that identified [Defendant] . . . ." Partridge then obtained a search warrant for a DNA sample from Defendant and took the sample by rubbing a buccal swab in Defendant's mouth. Partridge submitted a lab request to have the swabs of suspected blood be tested for a DNA profile. Partridge submitted another lab request to compare the swab from Defendant with the swabs of suspected blood that were collected from the crime scene. Partridge also requested that the fingerprints collected from the crime scene be compared with Defendant's.

¶ 5        Todd Roberts ("Roberts"), a fingerprint examiner at the CMPD crime lab, was admitted as a fingerprint expert without objection by Defendant. Roberts testified he analyzed the fingerprints collected from the window frame and compared them

with an ink print card containing Defendant's prints. Roberts opined a print on Defendant's ink print card was consistent with the latent fingerprint obtained from the window frame.

¶ 6     Shannon Guy ("Guy"), a DNA criminalist at the CMPD crime lab, analyzed the blood left at the crime scene. Guy was tendered as an expert in DNA analysis and identification without objection by Defendant. Guy testified she generated a DNA profile from the suspected blood swab collected from the blinds and compared it with the full "single-source DNA profile" obtained in Defendant's buccal swab. Guy formed the opinion the sample collected from the blinds matched the DNA collected from Defendant and testified "there were no inconsistencies across all 24 areas" of the DNA samples she analyzed.

¶ 7     On 5 March 2018, a Mecklenburg County grand jury indicted Defendant on the charges of felonious breaking or entering, in violation of N.C. Gen. Stat. § 14-54(a); larceny after breaking or entering, in violation of N.C. Gen. Stat. § 14-72(b)(2); and attaining habitual breaking and entering offender status, in violation of N.C. Gen. Stat. § 14-7.26.

¶ 8     On 13 April 2021, a jury trial began before the Honorable Hugh B. Lewis, judge presiding. The trial was bifurcated, and the jury addressed the issue of Defendant's guilt in relation to the two substantive offenses in the first phase of the trial. In the

second phase of the trial, the jury addressed the issue of enhancement as a habitual offender. Defendant was not present for the last day of his trial, 15 April 2021. On 15 April 2021, the jury returned its verdicts, finding Defendant guilty, *in absentia*, of felonious breaking or entering and larceny after breaking or entering.

¶ 9       Following the jury rendering its verdicts in the first phase, the trial court began the second phase of the proceeding for the jury to consider the habitual breaking and entering status. The trial judge announced to the jury: "The State will present evidence relating to previous convictions of breaking and/or entering at this time." The State tendered into evidence a certified copy of Defendant's judgment from a prior conviction for breaking and/or entering. Counsel for Defendant moved to dismiss at the close of the State's evidence and after the close of all evidence, and the motions were denied. Defendant did not object to the jury instruction regarding habitual breaking and entering. At the conclusion of the second phase of trial, the jury returned a verdict finding Defendant guilty, *in absentia*, of attaining habitual breaking and entering offender status.

¶ 10      Due to Defendant's absence at the last day of trial, Defendant's sentencing hearing took place on 21 May 2022 before the Honorable W. Robert Bell. Defendant was sentenced to a minimum of thirty months and a maximum of forty-eight months

in the custody of the North Carolina Department of Corrections. Defendant gave oral notice of appeal in open court after the trial court entered judgment.

## II. Jurisdiction

As an initial matter, we consider Defendant's petition for writ of *certiorari*. On 13 May 2022, Defendant filed with this Court a petition for writ of *certiorari* contemporaneously with his brief, in the event his oral notice of appeal was deemed inadequate.

Rule 4 of the North Carolina Rules of Appellate Procedure permits a "party entitled by law to appeal from a judgment" to "take appeal by . . . giving oral notice of appeal at trial . . . ." N.C. R. App. P. 4(a)(1).

Here, counsel for Defendant gave oral notice of appeal while the trial court was in open session, and immediately after the trial court entered its judgment against Defendant. Defendant did not file written notice of appeal. The State does not challenge the sufficiency of Defendant's oral notice of appeal.

Because Defendant gave oral notice of appeal in open court immediately upon entry of the final judgment, Defendant properly gave "notice of appeal *at trial*," as required by Rule 4. *See State v. Lopez*, 264 N.C. App. 496, 503, 826 S.E.2d 498, 503 (2019) (explaining oral notice of appeal given before the entry of final judgment is premature, and consequently, inadequate notice); *see also* N.C. R. App. P. 4(a)(1).

Thus, we deem Defendant's petition for writ of *certiorari* unnecessary and dismiss the petition. *See State v. Howard*, 247 N.C. App. 193, 205, 783 S.E.2d 786, 794–95 (2016) (dismissing the State's petition for writ of *certiorari* where our Court deemed the petition was not needed to confer the Court's jurisdiction).

¶ 15 Therefore, this Court has jurisdiction to address Defendant's appeal from a final judgment pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2021) and N.C. Gen. Stat. § 15A-1444(a) (2021).

### III. Issues

¶ 16 The issues before this Court are: (1) whether the trial court violated N.C. Gen. Stat. §§ 15A-1222 and 15A-1232 when it communicated to the jury that the State would be "present[ing] evidence relating to previous convictions of breaking and/or entering"; (2) whether the trial court plainly erred when it admitted the expert opinions of Roberts and Guy on the grounds their testimonies lacked the necessary foundation for admissibility under Rule 702; and (3) whether the trial court's designation of the habitual breaking and entering status offense as a Class E felony on the written judgment constitutes a clerical error.

### IV. Jury Instructions in Second Phase of Trial

¶ 17 In his first argument, Defendant contends the trial court prejudicially erred by communicating to the jury that the "State will present evidence relating to [Defendant's] previous convictions of breaking and/or entering" because proof of such

prior conviction "was an essential element of the charge that the jury was required to determine." The State argues the trial court did not err in these instructions to the jury because "[t]he trial court was simply informing the jury of what the State was planning to do, not expressing an opinion that would sway the jury." After careful review, we agree with the State and find no error.

## A. Standard of Review

This Court reviews a trial court's comments for a violation of N.C. Gen. Stat §§ 15A-1222 or 15A-1232 using a "totality of the circumstances" test. *State v. Gell*, 351 N.C. 192, 207, 524 S.E.2d 332, 342, *writ denied*, 531 U.S. 867, 121 S. Ct. 163, 148 L. Ed. 2d 110 (2000). "Whenever a defendant alleges a trial court made an improper statement by expressing an opinion on the evidence in violation of [N.C. Gen. Stat.] §§ 15A-1222 and 15A-1232, the error is preserved for review without objection due to the mandatory nature of these statutory prohibitions." *State v. Duke*, 360 N.C. 110, 123, 623 S.E.2d 11, 20 (2005) (citation omitted), *writ denied*, 549 U.S. 855, 127 S. Ct. 130, 166 L. Ed. 2d 96 (2006); *see also In re E.D.*, 372 N.C. 111, 119, 827 S.E.2d 450, 456–57 (2019) (explaining a statutory mandate may be automatically preserved when it either: (1) requires the trial judge to take a specific action, or (2) clearly leaves the responsibility to the presiding judge at trial).

¶ 19        "[A] defendant claiming that he was deprived of a fair trial by the judge's remarks has the burden of showing prejudice in order to receive a new trial." *Gell*, 351 N.C. at 207, 524 S.E.2d at 342; *see also State v. Sidbury*, 64 N.C. App. 177, 179, 306 S.E.2d 844, 845 (1983) ("While not every improper remark will require a new trial, a new trial may be awarded if the remarks go to the heart of the case."). "Unless it is apparent that [the statutory violation] might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless." *State v. Larrimore*, 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995) (citation omitted).

**B. Analysis**

¶ 20        Defendant argues the trial court stated to the jury that Defendant "had prior breaking and entering offenses," which was a "grossly improper and erroneous" remark. We disagree with Defendant as to the substance of the trial court's comment and conclude the trial court's statement did not amount to error, let alone plain error. In addition, the trial court instructed the jury that it was the jury's role to make factual findings and to not draw inferences regarding the evidence from what the trial court did or said.

¶ 21        "The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1222 (2021). Further, "the judge shall not express an opinion as to whether or

not a fact has been proved[,]" while instructing the jury. N.C. Gen. Stat. § 15A-1232 (2021). This is because "[j]urors entertain great respect for [the trial judge's] opinion, and are easily influenced by any suggestion coming from [the trial judge]." *State v. Carter*, 233 N.C. 581, 583, 65 S.E.2d 9, 10 (1951).

¶ 22 To convict a person of the status offense of habitual breaking and entering, the State must prove the individual "has been convicted of or pled guilty to one or more prior felony offenses of breaking and entering . . . ." N.C. Gen. Stat. § 14-7.26 (2021). "In all cases in which a person is charged [as a habitual breaking and entering] status offender, the record of prior conviction of the felony offense of breaking and entering shall be admissible in evidence, but only for the purpose of proving that the person had been convicted of a former felony offense of breaking and entering." N.C. Gen. Stat. § 14-7.29 (2021).

¶ 23 Defendant cites *State v. Guffey*, 39 N.C. App. 359, 250 S.E.2d 96 (1979), *State v. Whitted*, 38 N.C. App. 603, 248 S.E.2d 442 (1978), and *State v. McEachern*, 283 N.C. 57, 194 S.E.2d 787 (1973) to argue the trial court's remark "goes to the heart of the case." These cases, where the trial courts' comments warranted new trials, are readily distinguishable from the instant case, where the trial court's statement was a forecast of the proceeding—not an expression of opinion.

¶ 24 In *Guffey*, the trial court stated the defendant "was pretty busy that day," in

explaining why the indictment charged the defendant with two crimes. 39 N.C. App. at 361, 250 S.E.2d at 97 (emphasis removed). In *Whitted*, the trial court advised the jury what the court believed the evidence tended to show. 38 N.C. App. at 605, 248 S.E.2d at 443. In *McEachern*, the trial court asked a prosecuting witness whether she was raped in the car, where the witness had not testified she had been raped. 283 N.C. at 59, 194 S.E.2d at 789. As discussed in greater detail below, the trial court's comments, unlike the courts' remarks in *Guffey*, *Whitted*, and *McEachern*, were neither an expression of an opinion as to Defendant's guilt nor the evidence in this case.

Here, the trial court informed the jury: "Now at this time, the State has brought against [D]efendant the charge of habitual breaking and/or entering. The State *will present evidence relating to* previous convictions of breaking and/or entering at this time." (Emphasis added). After the presentation of all evidence, the trial court explained to the jury the habitual status offender charge as well as the elements the State must prove: "For you to find [D]efendant guilty of this offense, the State must prove beyond a reasonable doubt that on October 30th of 2015, [D]efendant, in Superior Court of Mecklenburg County, was convicted of the offense of felonious breaking or entering, which was committed on or about May 28th, 2015."

¶ 26     In examining the trial transcript, we conclude the trial court did not offer to the jury the court's opinion as to whether Defendant did in fact have previous convictions.  *See Gell*, 351 N.C. at 207, 524 S.E.2d at 342; *see also* N.C. Gen. Stat. § 15A-1222; N.C. Gen. Stat. § 15A-1232.  Rather, the trial court notified the jury and the parties of its plan for the outset of the second phase of trial: to allow the State to offer evidence in support of the habitual breaking and entering status offender charge.

¶ 27     After the trial court made its comment, the State admitted into evidence a certified copy of Defendant's prior felony breaking or entering conviction.   The State also offered testimony from Partridge, who investigated Defendant's breaking and/or entering case, which resulted in this previous conviction.  After the State presented its evidence, the trial court asked Defendant if he would "be putting on any evidence relating to [the charge]?"  Defendant did not offer evidence.  Presuming, *arguendo,* the trial court's comment was improper, the State offered ample evidence of Defendant's "prior felony offense[ ] of breaking and entering," from which a jury could reasonably find Defendant guilty of the status offense charge. *See* N.C. Gen. Stat. § 14-7.26; *see also State v. Austin*, 378 N.C. 272, 2021-NCSC-87, ¶¶ 26-27 (holding the trial court did not commit prejudicial error where the State satisfied all elements of the crime charged, and the trial court instructed the jury that it must determine the

facts). Defendant has failed to show the jury would have reached a different verdict without the trial court's comment; therefore, we find no prejudicial error. *See Gell*, 351 N.C. at 207, 524 S.E.2d at 342; *see also* N.C. Gen. Stat. § 15A-1443(a) (2021) (defining prejudicial error and explaining the burden of showing prejudice in criminal cases is upon the defendant).

¶ 28 Defendant further argues the trial court's alleged error was "exacerbated" because the trial court did not give the parties the opportunity to make opening and closing statements regarding the habitual breaking and entering charge; Defendant was absent for the habitual breaking and entering phase; and the trial court "did not re-instruct the jury on fundamental principles, including presumption of innocence, burden of proof, reasonable doubt, [D]efendant's right to testify, and the requirement for a unanimous verdict."

¶ 29 The North Carolina Criminal Procedure Act governs the parties' opening and closing statements to the jury. "Each party must be given the opportunity to make a brief opening statement . . . ." N.C. Gen. Stat. § 15A-1221(a)(4) (2021). "At the conclusion of the evidence, the parties may make [closing] arguments to the jury in accordance with the provisions of [N.C. Gen. Stat. §] 15A-1230." N.C. Gen. Stat. § 1221(a)(8) (2021). In order for a defendant "to assert a constitutional or statutory right on appeal, the right must have been asserted and the issued raised before the

trial court*.*" *State v. McDowell*, 301 N.C. 279, 291, 271 S.E.2d 286, 294 (1980) (citation omitted), *writ denied*, 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 220.

¶ 30      In *State v. McDowell*, our Supreme Court considered whether the trial court's failure to give the defendant the opportunity to present an opening statement, pursuant to N.C. Gen. Stat. § 15A-1221(a)(4), amounted to prejudicial error. 301 N.C. at 290–91, 271 S.E.2d at 294. The Court held the defendant waived his statutory right to make an opening statement by failing to request the opportunity to do so, and by therefore "engag[ing] in conduct inconsistent with a purpose to insist upon the exercise of a statutory right." *Id.* at 291, 271 S.E.2d at 294.

¶ 31      Here, the trial court properly instructed the jury on the elements of the substantive offenses in the initial phase of trial. The trial court then explained the relevant rules of law, including, *inter alia*: direct and circumstantial evidence, the State's burden of proving Defendant's guilt beyond a reasonable doubt, the presumption of Defendant's innocence, the jury's duty of determining witness credibility and the weight of the evidence, Defendant's right to not testify, and the presiding judge's duty to be impartial. Finally, the trial court instructed the jury that "[D]efendant's absence is not to create any presumption against him[,] and is not to influence your decision in any way."

¶ 32        Before the jury was brought back in from deliberations on the substantive charges, the trial court advised the State and Defendant's counsel that the court would not be re-instructing on the preliminary instructions.  It further advised it would be reading *verbatim*, North Carolina Pattern Jury Instruction 214.20 on habitual breaking and entering, *see* N.C.P.I. – Crim. 214.20, if and when the jury returned with a guilty verdict on the felony breaking or entering charge.  Counsel for Defendant did not object to the trial court's plan for the second phase of the trial.

¶ 33        After the jury returned and announced its guilty verdicts as to the felonious breaking or entering, and larceny after breaking or entering, the trial court advised the jury the State would be presenting evidence as to the charge of habitual breaking and entering.  The State presented its evidence, and the trial court then proceeded to instruct the jury as follows: "Please recall all the previous jury instructions that I have read to you[,] and now I will instruct you on the substance of this charge and how you are to make your decision in this charge."  The trial court then read the pattern jury instruction for the charge of habitual breaking and entering.

¶ 34        Like the defendant in *McDowell*, Defendant did not object to the trial court's failure to provide the parties with an opportunity to present a brief opening statement or a closing argument, nor did Defendant request opening or closing statements.  Thus, Defendant waived his statutory right to make such statements in the habitual

status offender phase of his trial. *See McDowell*, 301 N.C. at 291, 271 S.E.2d at 294. Furthermore, Defendant has not provided support for his argument that the trial court erred by proceeding in the second phase of trial in Defendant's absence; therefore, we deem this apparent argument abandoned. *See* N.C. App. P. 28(b)(6).

Similarly, we conclude Defendant waived review of his argument as to jury re-instruction. North Carolina General Statute Section 15A-1231 governs the trial court's instructions to the jury. N.C. Gen. Stat. § 15A-1231 (2021). It is well established in North Carolina that courts will not find prejudicial error in jury instructions where, taken as a whole, they "present[ ] the law fairly and clearly to the jury . . . ." *State v. Chandler*, 342 N.C. 742, 752, 467 S.E.2d 636, 641, *writ denied*, 519 U.S. 875, 117 S. Ct. 196, 136 L. Ed. 2d 133 (1996). "[I]solated expressions [of the trial court], standing alone," will not warrant reversal "when the charge as a whole is correct." *Id.* at 751–52, 467 S.E.2d at 641. When a defendant does not object to jury instructions, we review for arguments relating to instructions under the plain error standard. *State v. Collington*, 375 N.C. 401, 410, 847 S.E.2d 691, 698 (2020). In order for our Court to review "an alleged error under the plain error standard, the defendant must 'specifically and distinctly' contend that the alleged error constitutes plain error" in his brief. *State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) (quoting N.C. R. App. P. 10(a)(4)).

¶ 36    Here, counsel for Defendant did not request the trial court to re-instruct on the pertinent rules of law, despite the trial court advising the parties that it did not intend to re-state its earlier instructions.  Hence, Defendant would only be entitled to plain error review on appeal.  Because Defendant did not "specifically and distinctly" allege in his brief this alleged error amounts to plain error, he has waived review of the issue.  *See Lawrence*, 365 N.C. at 516, 723 S.E.2d at 333; *see also* N.C. R. App. P. 10(a)(4).

¶ 37    After examining the totality of the circumstances, including the trial court's instructions to the jury as a whole, and the State's evidence presented at trial, we conclude the trial court did not commit prejudicial error in communicating to the jury that the State would be presenting evidence relating to Defendant's prior convictions. *See Gell*, 351 N.C. at 207, 524 S.E.2d at 342.

### V.    Admission of Expert Witness Testimony

¶ 38    In his second argument, Defendant contends the trial court plainly erred when it admitted the expert opinions of Roberts and Guy because each testimony lacks the necessary foundation for admissibility under Rule 702.  The State argues that the trial court did not err by admitting the expert opinions of Roberts and Guy because both testimonies were relevant and reliable, and meet the requirements of Rule 702. After careful review of the expert testimonies, we discern no prejudicial error.

**A. Standard of Review**

Generally, this Court reviews the admissibility of expert testimony under Rule 702 for an abuse of discretion. *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016). However, where a defendant does not preserve his or her objection as "to the performance of a trial court's gatekeeping function in admitting opinion testimony in a criminal trial," we review the alleged error under the plain error standard. *State v. Hunt*, 250 N.C. App. 238, 246, 792 S.E.2d 552, 559 (2016); *see also* N.C. R. App. P. 10(a)(4) (specifying plain error review may be used in some circumstances when an issue is not preserved, and the defendant "specifically and distinctly" alleges plain error on appeal).

Defendant concedes he did not challenge the trial court's admission of the expert testimony, and therefore, asserts plain error review is the proper standard for our review. We agree and note Defendant "specifically and distinctly" contends on appeal that the trial court's admission of the expert testimony at issue constitutes plain error; thus, we proceed in reviewing these arguments for plain error. *See Hunt*, 250 N.C. App. at 246, 792 S.E.2d at 559; *see also* N.C. R. App. P. 10(a)(4).

**B. Analysis**

Rule 702 of the North Carolina Rules of Evidence governs the trial court's admission of expert testimony. Rule 702 provides in pertinent part:

> If scientific, technical or other specialized knowledge will

> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion, or otherwise, if all
> of the following apply:
>
> (1) The testimony is based upon sufficient facts or data.
>
> (2) The testimony is the product of reliable principles and
>     methods.
>
> (3) The witness has applied the principles and methods
>     reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, N.C. R. Evid. 702(a)(1)-(3) (2021). "The precise nature of the

reliability inquiry will vary from case to case depending on the nature of the proposed

testimony. In each case, the trial court has discretion in determining how to address

the three prongs of the reliability test." *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9

(explaining the United States Supreme Court's *Daubert* factors, including a

technique's known or potential rate of error, "are part of a 'flexible' inquiry" and do

not create "a definitive checklist or test"). In any event, "[t]he primary focus of the

inquiry is on the reliability of the witness's principles and methodology, not on the

conclusions that they generate." *Id.* at 890, 787 S.E.2d at 9 (citations and quotation

marks omitted).

### 1. *Roberts' Latent Fingerprint Testimony*

Defendant argues that the trial court committed plain error in admitting

Roberts' expert testimony because Roberts did not testify that the process he used

was scientifically accepted in the community, how he applied that process in this case, or the rate of error associated with the process that he uses.

¶ 43 Defendant relies on *State v. McPhaul* in arguing the trial court abused its discretion by permitting Roberts to provide his expert testimony. 256 N.C. App. 303, 808 S.E.2d 294 (2017). As explained above, the issue before this Court is not whether the trial court abused its discretion in admitting Roberts' testimony, but rather, whether it *plainly erred*. In *McPhaul*, our Court concluded the fingerprint expert's testimony was insufficient to meet the requirement of Rule 702(a)(3) because the witness did not testify *how* she "applied the principles and methods reliably to the facts of th[at] case." *Id.* at 316, 808 S.E.2d at 305; *see also* N.C. Gen. Stat. § 8C-1, N.C. R. Evid. 702(a)(3). Nevertheless, we held that although the trial court abused its discretion, the error did not prejudice the defendant because "[t]he State presented abundant additional evidence," which tended to demonstrate the defendant's guilt. *Id.* at 316–17, 808 S.E.2d at 305.

¶ 44 Defendant cites *State v. Koiyan*, 270 N.C. App. 792, 841 S.E.2d 351 (2020) in his reply brief as further support for his assertion the trial court plainly erred. In *Koiyan*, our Court reviewed the testimony from fingerprint examiner Todd Roberts— the same fingerprint examiner in this case—under the plain error standard. *Id.* at 794, 841 S.E.2d at 353. There, Roberts provided sufficient testimony to demonstrate

his "qualifications, training, and expertise, and showed that [he] uses reliable principles and methods." *Id.* at 797, 841 S.E.2d at 354. Yet Roberts "never explained what—if any—characteristics from the latent fingerprints matched with [the d]efendant's fingerprints"; therefore, his conclusions failed to meet the statutory requirement of Rule 702(a)(3). *Id.* at 798, 841 S.E.2d at 355. Despite this deficient expert testimony, we declined to conclude the trial court committed plain error due to "the otherwise overwhelming evidence that [the defendant] was the perpetrator of the robbery." *Id.* at 798, 841 S.E.2d at 355.

¶ 45    Here, Roberts was admitted as a fingerprint expert without objection by Defendant after Roberts testified as to his training, experience, and education, as well the basics of fingerprint analysis. He worked for the CMPD for over twenty-two years and earned a Bachelor of Science in criminal justice and an associate's degree in correctional and juvenile services. Apart from in-house training, Roberts also received "formal training in fingerprint comparisons, latent fingerprint photography, forensic ridgeology, advance palm print comparison techniques, logical latent analysis, analysis of distortion in latent prints, and . . . advanced latent analysis[.]"

¶ 46    Roberts described the basics of fingerprint analysis, including friction ridge skin and inked prints. "Friction ridge skin is the raised and lowered areas of your skin that's located on your fingers, palms, and also on the soles of your feet." "An

inked print is the intentional reproduction of . . . friction ridge skin[.]" Roberts explained that fingerprints can be used for human identification because they are unique to every individual, and no two people have the same fingerprints.

¶ 47      Roberts explained how and when a latent print is transferred onto a surface. Roberts then testified to the unique characteristics of fingerprints and the level of detail fingerprints possess:

> The fingerprints themselves have three levels of detail. One is simply ridge flow, which allows us to easily exclude a potential donor to a fingerprint. There's level II detail, which is made up of bifurcations and ending ridges, which I will—do you have a pencil or pen? When I talk about level I detail, it's simply the ridge flow. This print here has the ridge flow coming in from the right side of the print looping around what I refer to as a core, and then right back out the right side, so this is referred [to] as a right slant loop. The distance between the core, here, and the delta is also a level I detail in which we could use to help narrow down an identification.
>
> But the important part are all of these ending ridges and bifurcations throughout this print, and their spatial relationship to each other. That's what makes that print unique, and unique to everyone. And not only is it unique to everyone, it's unique to that finger, so none of the 10 figures are the same. Even though this is a right slant loop, you can see this one has more of a circular pattern, but still coming in from the right and going out to the right, and this is a left slant loop.
>
> But ultimately[,] it's those ending ridges and bifurcations, their relationship to each other, and I can't zoom in any further but there is a third type of detail which includes the pores. Where the pores actually lay in the ridge[s]

themselves also bears weight to our identification process when [they] need to[.] Very rarely used, just because that amount of detail usually doesn't exist within the latent print collected from a crime scene, but sometimes.

¶ 48     Roberts further explained basic fingerprint types, the different levels of detail found in a print, and the tool he uses to examine fingerprints:

> [Roberts]: There are loops, whorls, and arches.
>
> [Prosecutor]: And can you describe what each looks like for the jury?
>
> [Roberts]: Sure. A loop is like I described on the screen. It comes in one side of the screen, goes around what we refer to as a core, and right back out the same side. A whorl-type pattern would be more of a circular, in some way, shape or form, it is a circular pattern or bullseye pattern in the fingerprint. The third is the arch, which means that it pretty much comes in one side of the finger, kind of elevates, and then goes right back out the other side.
>
> [Prosecutor]: So when you were explaining just the different characteristics of fingerprints, you mentioned bifurcations. What other—and you called them level II details. What are other level II details that you look at?
>
> [Roberts]: [T]here are bifurcations and ending ridges. [T]wo opposing bifurcations make, like, an island, or an enclosure, which makes them both unique. Two ending ridges fairly close together could be a short ridge, but ultimately[,] it's all bifurcations. It's all ending ridges, and it all boils down to their relationship to each other.
>
> [Prosecutor]: Now, what type of instrument do you use, if any, back at the lab to examine fingerprints?
>
> [Roberts]: We use a type of magnifier, a magnifying glass,

not microscopic, but we do magnify the image.

¶ 49 Roberts described the process of analyzing and comparing a latent print obtained from a crime scene with an ink print:

> [Roberts]: "Physically, I take the latent fingerprint card collected from the crime scene. I fold it so that I can sit it right next to the print that I want to compare it to. They are both placed under magnification, and I am looking mainly at that level I and level II detail for both similarities and dissimilarities.
>
> [Prosecutor]: So when you look at a latent . . . and an ink print, . . . are you trying to find areas where there is disagreement?
>
> [Roberts]: Yes.
>
> [Prosecutor]: So basically[,] you're trying to prove that the latent and the ink print are not a match. Is that correct?
>
> [Roberts]: Well, both. I'm looking for areas of agreement along with areas of disagreement.
>
> [Prosecutor]: If you find one area of disagreement, do you continue with your analysis?
>
> [Roberts]: No, ma'am.
>
> [Prosecutor]: Does it matter, if you have 10 areas of agreement, if there is one area of disagreement?
>
> [Roberts]: No, ma'am.
>
> [Prosecutor]: And so, what happens if you're looking— you're examining the print and you don't see any areas of disagreement?
>
> [Roberts]: Then that would steer me toward an

identification.

[Prosecutor]: So if you don't see any disagreement, would you consider those fingerprints consistent with each other?

[Roberts]: If there is enough information present within both, yes.

[Prosecutor]: What if there's not enough information?

[Roberts]: Then that may result in what we refer to as an inconclusive.

[Prosecutor]: So, if you do have enough, and you're able to come to a conclusion, what's the next step in your process?

[Roberts]: The next step would be a verification process with my supervisor.

[Prosecutor]: And what does a verification process with your supervisor mean?

[Roberts]: He is given the case along with the 10-print card, and he is asked to agree or disagree with my conclusions.

[Prosecutor]: So does he do the same analysis that you did?

[Roberts]: Yes, ma'am.

[Prosecutor]: And do you guys do this in every case?

[Roberts]: Yes, ma'am.

[Prosecutor]: So you testified that you've conducted fingerprint analysis quite a few times. Do you find prints that are consistent with one another every single time you do a fingerprint analysis?

[Roberts]: No, ma'am.

[Prosecutor]: Do you find fingerprints that are consistent

with one another in the majority of the fingerprint analysis
that you do?

[Roberts]: No, ma'am.

¶ 50          Under plain error review, Defendant fails to provide support for his argument that Roberts' expert testimony was erroneously admitted into evidence on the grounds Roberts did not testify his process was scientifically accepted in the community, and he did not disclose error rates related to his processes. Therefore, we consider these arguments abandoned. *See* N.C. R. App. P. 28(b)(6). Our Supreme Court has "recognized that fingerprinting is an established and scientifically reliable method of identification." *State v. Parks*, 147 N.C. App. 485, 490, 556 S.E.2d 20, 24 (2001); *see State v. Rogers*, 233 N.C. 390, 398, 64 S.E.2d 572, 578 (1951). Additionally, neither factor proffered by Defendant is required by statute or caselaw in this state. *See* N.C. Gen. Stat. § 8C-1, N.C. R. Evid. 702(a); *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9.

¶ 51          We next consider whether Roberts "applied [his fingerprint analysis] principles and methods reliably to the facts of th[is] case." *See* N.C. Gen. Stat. § 8C-1, N.C. R. Evid. 702(a)(3). Here, Roberts testified he compared the latent fingerprint card collected at the crime scene with a card containing Defendant's ten ink fingerprints retrieved from the Automated Fingerprint Identification System (the "AFIS"), "a state maintained database for fingerprints." The prosecutor asked Roberts to

describe the comparison and analysis process he used in this case:

> [Prosecutor]: After you received this latent print for examination, did you then do a comparison, as you previously described you do in your work, to the known 10-inkprint card that belongs to [D]efendant?
>
> [Roberts]: Not initially. I was not—I did not compare the prints to [D]efendant until I was requested to by the detective.
>
> [Prosecutor]: And once you were requested, did you then compare it to [D]efendant's known ink prints?
>
> [Roberts]: Yes, ma'am.
>
> [Prosecutor]: Were you able to find a print on [D]efendant's ink print card that was consistent with this latent print that was found at the crime scene?
>
> [Roberts]: Yes, ma'am.
>
> [Prosecutor]: And when you say consistent, does that mean that you found no dissimilarities between the two prints?
>
> [Roberts]: That is correct.
>
> [Prosecutor]: Had you found one dissimilarity, would your analysis have stopped right there?
>
> [Roberts]: A dissimilarity, yes, it would have stopped.
>
> [Prosecutor]: Was your conclusion submitted to your supervisor for peer review?
>
> [Roberts]: Yes, ma'am.
>
> [Prosecutor]: And did they agree with your findings?
>
> [Roberts]: Yes, ma'am.

> [Prosecutor]: And this latent print that I've marked as State's Exhibit 18, do you recall to which of [D]efendant's finger it was consistent with?
>
> [Roberts]: It's the number one finger, and just to clarify, there are two prints on that card. Both were identified to the number one finger of Jordan Montez Graham, number one being the right thumb.

¶ 52    In this case, Roberts' testimony does not clearly indicate that Roberts used the comparison process he described in his earlier testimony when he compared Defendant's ink print card to the latent fingerprints recovered at the crime scene. Like the testimonies in *McPhaul* and *Koiyan*, Roberts' testimony lacks detail concerning the methodology he used in comparing the prints and the fingerprint characteristics he considered in reaching his conclusions. Instead, Roberts' testimony, which is strikingly similar to the testimony he gave in *Koiyan*, demonstrates he compared the two sets of prints, found the prints to be consistent, identified no dissimilarities, and his supervisor reached the same result. Thus, Roberts did not "establish that [he] reliably applied [his] procedure to the facts" in the instant case. *See McPhaul*, 256 N.C. App. at 315, 808 S.E.2d at 304; *see also* N.C. Gen. Stat. § 8C-1, N.C. R. Evid. 702(a)(3). Therefore, we conclude again Roberts' testimony is insufficient to meet the reliability requirements of Rule 702, and the trial court erred in admitting it. *See Koiyan*, 270 N.C. App. at 798, 841 S.E.2d at 355; *see also* N.C. Gen. Stat. § 8C-1, N.C. R. Evid. 702(a).

### *2. Guy's DNA Analysis Testimony*

¶ 53        Defendant argues that the trial court committed plain error in admitting Guy's expert testimony because Guy, like Roberts, failed to explain how she applied her processes to this case and did not indicate the error rate associated with her methods.

¶ 54        In *State v. Coffey*, our Court considered whether the trial court established a sufficient foundation under Rule 702(a)(3) to qualify a North Carolina State Crime Lab employee as an expert in DNA analysis. 275 N.C. App. 199, 853 S.E.2d 469 (2020). The expert witness testified as to the four-step process she uses to extract DNA from a defendant's buccal sample. *Id.* at 211–12, 853 S.E.2d at 479. The witness confirmed her procedures in analyzing DNA evidence were widely accepted as valid in the scientific community. *Id.* at 212, 853 S.E.2d at 479. Next, the witness testified she compared the defendant's buccal sample with a DNA profile extracted from a semen sample taken from the victim's clothing using her four-step process. *Id.* at 203, 853 S.E.2d at 473. She concluded the DNA profile obtained from the clothing matched the DNA profile obtained from the defendant. *Id.* at 213, 853 S.E.2d at 480. In concluding the testimony met the requirements of Rule 702(a)(3), our Court reasoned the witness "thoroughly explained the methods and procedures of performing autosomal testing and analyzed [the] defendant's DNA sample following those procedures." *Id.* at 213, 853 S.E.2d at 480. We also acknowledged this

"particular method of testing has been accepted as valid within the scientific community and is a standard practice within the state crime lab." *Id.* at 213, 853 S.E.2d at 480.

¶ 55        Defendant contends *Coffey* is distinguishable because "Guy did not provide a sufficiently detailed description of the process used and how it applied to this case." We disagree and find no meaningful difference between the expert witness testimony in *Coffey* and Guy's testimony.

¶ 56        Before Guy was tendered as an expert in DNA analysis and identification, Guy testified as to her training, education, duties as a DNA criminalist, and professional background working in the field. She earned a Bachelor of Science degree in forensic chemistry from Ohio University and a master's degree from the University of Florida with specialization in forensic DNA and serology. As of the date of trial, she had analyzed tens of thousands of DNA samples over her twenty-one-year career in forensics. Guy further testified the CMPD crime lab is accredited and explained the standards that must be met for the lab to comply with the accreditation, as well as the measures taken by the lab for quality assurance. Guy met the crime lab's accreditation requirements for annual continuing education. She also described the peer review process and how that process ensures the reported results are correct.

¶ 57    After the trial court qualified Guy as an expert, Guy described what DNA is and explained that DNA is present in the cells of every person.  DNA samples fall into two categories: (1) "forensic unknowns," which are collected from crime scenes, and (2) "reference samples," which are taken from a known individual.  A buccal swab is an example of a reference sample.

¶ 58    Guy testified as to the process she and her lab use to analyze DNA samples, which is "widely accepted and used in the scientific community."  Guy explained the DNA from a crime scene can be matched with an individual after referencing buccal samples taken from swabs inside the cheek of an individual.   Once the swabs are collected, DNA is available for extraction, and a DNA criminalist can estimate the amount of DNA found in the sample, which is referred to as "quantitation."  The DNA would then be copied through "amplification," a process that turns DNA into a representation that allows for comparison of the DNA sample to known DNA standards from an individual.

¶ 59    Guy explained a full DNA profile means the "results were obtained at every single area of the DNA," and allows for the determination on whether the profile was male or female.  A full DNA profile enables a DNA criminalist to analyze twenty-four areas of the DNA.  A partial profile is one in which some areas of the DNA are

missing. Moreover, a single source sample contains information from only one individual, rather than multiple individuals.

¶ 60 Lastly, Guy testified that she generated a DNA profile from the suspected blood swab collected from the blinds and compared it with the full "single-source DNA profile" obtained in Defendant's buccal swab. In reviewing the profiles, Guy found "no inconsistencies across all 24 areas" of the DNA she analyzed. From this data, Guy opined the sample collected from the blinds matched the DNA collected from Defendant because she estimated there was a 1 in 130 octillion "probability of selecting a person at random that had the DNA profile obtained from the blinds . . . ."

¶ 61 Like the expert witness in *Coffey*, Guy thoroughly explained her credentials, education, and expertise, as well as the methods and procedures she uses to analyze DNA profiles. Guy confirmed the process is widely accepted in the scientific community. Guy testified she applied those methods and procedures in her analysis and comparison of Defendant's DNA profile with the suspected blood sample. Guy explained she arrived at her conclusion that the sample matched Defendant's DNA profile after reviewing all twenty-four areas of his full DNA profile. Although Guy did not provide a rate of error, this omission was not fatal to her testimony. *See McGrady*, 368 N.C. at 890, 787 S.E.2d at 9. Guy's DNA testimony sufficiently

detailed how she "applied the principles and methods reliably to the facts of the case"; therefore, the testimony meets the requirement of Rule 702(a)(3). *See Coffey*, 275 N.C. at 213, 853 S.E.2d at 480; *see also* N.C. Gen. Stat. § 8C-1, N.C. R. Evid. 702(a)(3).

### 3. *Prejudicial Error*

¶ 62        Based on our conclusion the trial court erred in admitting Roberts' testimony, we now determine whether this error constitutes plain error, warranting a new trial. For error to amount to plain error, "a defendant must demonstrate that a fundamental error occurred at trial" and that "the error had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (citations and quotation marks omitted). As our Supreme Court has emphasized,

> the plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is . . . something so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).

¶ 63        As discussed above, Guy's testimony regarding DNA analysis and identification was properly admitted at trial. This testimony is sufficient evidence from which a jury could reasonably conclude Defendant was guilty of the offenses charged. After examining the entire record, we conclude Defendant cannot show that the trial court's admission of Roberts' testimony had a probable impact on the jury

finding that Defendant was guilty. *See Odom*, 307 N.C. at 660, 300 S.E.2d at 378. Therefore, we find no prejudicial error in the trial court's admission of Roberts' testimony. *See Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334; *see also* N.C. Gen. Stat. § 15A-1443(a).

## VI.    Clerical Error in Written Judgment

¶ 64    In his third and final argument, Defendant asserts the trial court made a clerical error in its "written judgment [by] erroneously indicat[ing] that [he] was convicted of a [C]lass E felony" for the habitual breaking and entering status offense." The State contends the written judgment correctly reflects the trial court's judgment because it properly indicates that the habitual breaking and entering status offense enhanced the substantive offense of felony breaking and/or entering from a Class H felony to a Class E felony. After careful review, we agree with the State.

¶ 65    A clerical error is "[a]n error resulting from a minor mistake or inadvertence, [especially] in writing or copying something on the record, and not from judicial reasoning or determining." *State v. Jarman*, 140 N.C. App. 198, 202, 535 S.E.2d 875, 878 (2000) (citation omitted).

¶ 66    Here, trial court entered its judgment and commitment on Administrative Office of the Courts form AOC-CR-601. The judgment lists three offenses: (1) felony breaking and/or entering, (2) larceny after breaking and/or entering, and (3) habitual

breaking and entering. Habitual breaking and entering is identified as a Class E felony. The felony breaking and entering offense is identified as a Class H felony with a Punishment Class E, which the form notes "represents a status or enhancement." The written judgment also indicates, by a checked box, that the trial court "adjudge[d] the defendant to be a habitual breaking and entering status offender, to be sentenced as a Class E felon."

¶ 67        Relying on *State v. Eaton*, Defendant asserts remand is necessary to correct the alleged error on the judgment listing the status offense of habitual breaking and entering as a Class E felony. 210 N.C. App. 142, 707 S.E.2d 642 (2011). In *Eaton*, our Court *sua sponte* remanded the case for correction of a clerical error in the judgment because a substantive offense was incorrectly identified as a Class H felony where it should have been identified as a Class I felony. *Id.* at 155–56, 707 S.E.2d at 651. There, the defendant was found guilty of attaining the status of habitual felon and was properly sentenced for his felony substantive offenses as a Class C felon. *Id.* at 144, 156, 707 S.E.2d at 644, 651. Although this Court's opinion in *Eaton* does not mention in which class the habitual felon status offense was identified on the judgment, our review of the record in that case reveals the judgment designated the status offense as a Class C felony. The statute governing sentencing of habitual felons in effect at the time, provided an habitual felon "must . . . be *sentenced as a*

*Class C felon*" for any felony he or she commits under North Carolina law. N.C. Stat. Gen. § 14-7.6 (2009) (emphasis added); *see also Eaton*, 210 N.C. App. at 150, 707 S.E.2d at 648.

¶ 68      The statute governing sentencing of habitual breaking and entering status offenders provides a status offender "must . . . be *sentenced as a Class E felon*" for any felony offense of breaking and entering the offender commits under North Carolina law. N.C. Gen. Stat. § 14-7.31(a) (2021) (emphasis added).

¶ 69      Thus, the judgment in *Eaton* categorized habitual felon status as Class C, the felony class for which Defendant was to be sentenced for the pertinent substantive offense. Similarly, in this case, the judgment categorized the habitual breaking and entering status offense as a Class E felony, the felony class for which Defendant was to be sentenced for the underlying felony breaking and entering offense. Therefore, Defendant's reliance on *Eaton* for remanding this case is misplaced.

¶ 70      In this case, Defendant is not arguing that he was improperly sentenced or that a substantive offense was incorrectly classified. Rather, Defendant maintains he was not convicted of a Class E felony, and the judgment erroneously indicates that he was. Defendant was in fact convicted of the status offense of habitual breaking and entering; hence, we next consider whether the trial court improperly identified the offense as a Class E felony.

¶ 71      The reason for establishing that an offender has attained habitual breaking and entering status "is to enhance the punishment which would otherwise be appropriate for the substantive [breaking and entering] felony which [the defendant] has allegedly committed while in such a status." *State v. Penland*, 89 N.C. App. 350, 351, 365 S.E.2d 721, 721 (1988) (citation omitted).  Our case law clearly indicates status offenses are not substantive offenses and therefore do "not support a criminal sentence," standing alone.  *State v. Taylor*, 156 N.C. App. 172, 175, 576 S.E.2d 114, 116 (2003).  Nevertheless, our Legislature did not specify the felony classes for which status offenses should be classified.

¶ 72      We note the North Carolina Judicial Branch publishes on its website a guideline document entitled "N.C. Courts Offense Codes and Classes."  N.C. Judicial Branch, *N.C. Courts Offense Codes and Classes* (July 27, 2022), https://www.nccourts.gov/documents/publications/nc-courts-offense-codes-and-classes (last visited Dec. 16, 2022).  This document classifies the status offense of habitual breaking and entering as a Class E felony, and habitual felon status as a Class C felony.  *Id.*  Defendant provides no other authority to support his contention that the written judgment contains a clerical error, and we conclude trial court's identification of habitual breaking and entering as a Class E *status offense*, as compared to a Class E *substantive offense*, was not error.

Because the written judgment clearly indicates the offenses for which Defendant was found guilty as well as the offense classes and punishment classes, properly notates the criminal statute governing each offense, and correctly indicates Defendant's sentence, we discern no clerical error from the trial court's classification of the status offense as a Class E felony.

## VII. Conclusion

We dismiss Defendant's petition for writ of *certiorari* as superfluous because Defendant's oral notice of appeal properly conferred jurisdiction to this Court. We hold that the trial court did not err when it communicated to the jury that the State would be presenting evidence relating to Defendant's prior conviction of breaking or entering. Further, we hold the trial court did not plainly err by admitting the expert opinions of Roberts and Guy because their testimonies satisfy foundation requirements for admissibility under Rule 702. Finally, we conclude the written judgment did not contain a clerical error. In sum, our examination of the record reveals Defendant received a fair trial, free from prejudicial error.

NO ERROR.

Judges TYSON and WOOD concur.